# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

CIVIL ACTION NO. 1:13-cv-1511 WYD-BNB

PORT-A-POUR, INC.
a Colorado corporation

    Plaintiff

v.

PEAK INNOVATIONS, INC.
a Colorado corporation, and
MARK E. NELSON
an individual

    Defendants and Counter Claim Plaintiffs

and

PORT-A-POUR, INC.
a Colorado corporation, and
JEROME J. DOHERTY, and
NEIL G. OBERG
individuals

    Counter Claim Defendants.

## MOTION FOR PRELIMINARY INJUNCTION

PLAINTIFF PORT-A-POUR, INC., moves for a preliminary injunction against defendants PEAK INNOVATIONS, INC. ("Peak") and MARK E. NELSON pursuant to FRCP 65. This motion is timely filed pursuant to the court's Order entered at the status conference of July 16, 2013, which ordered Plaintiff to file its Preliminary Injunction motion on or before October 25, 2013.

**BACKGROUND AND INTRODUCTION**

This case was filed in early June to redress defendants' ongoing infringement of Port-a-Pour's patent, trademark, trade name, and trade secrets, which Peak had licensed from Port-a-Pour, but which Peak never stopped using after the termination of the license agreement. Port-a-Pour's proprietary technology that it licensed to Peak (the "Licensed Rights") concerns a portable concrete batch plant and related equipment developed and owned by Port-a-Pour. The Licensed Rights are proprietary to Port-a-Pour and are protected by two patents, a trademark, the Colorado Uniform Trade Secrets Act, and contractual agreements between Port-a-Pour on the one hand, and Peak and Nelson on the other. Port-a-Pour filed this action when it became convinced that Peak was deliberately and willfully escalating its infringement of the Licensed Rights, including by renewing the URL www.port-a-pour.com on June 7, 2013.

A hearing on Port-a-Pour's motion for temporary restraining order was held on June 25, 2013. Literally one day before the hearing Peak scrubbed its website to remove the most egregious evidence of its ongoing infringing activities, namely, pictures of Port-a-Pour equipment that it was offering for sale. In addition, Peak stopped its egregious practice of redirecting the URLs www.portapour.com and www.port-a-pour.com to its own site, such that now those URLs return error messages. At the TRO hearing defendant Peak Innovations represented to the court that Peak was no longer offering any products that use the Licensed Rights. Largely on the basis of defendants' assurance that there is "nothing to enjoin," the court denied Port-a-Pour's motion for a temporary restraining order and ordered limited discovery to permit investigation into what, exactly, Peak continues to offer for sale.

As Peak's discovery responses demonstrate, Peak continues to infringe on every single element of the two Patents and continues to misuse every element of the Licensed Rights that are the subject of this action. Once it served its discovery responses, Peak ended its misleading practice of describing its offerings on its website in only the vaguest of terms, and, contemporaneously with serving discovery responses in September, Peak modified its web site again to reflect its *actual* offerings—which include numerous products infringing on every one of Port-a-Pour's proprietary Licensed Rights. Today, Peak's website once again prominently features a reconfigured Port-a-Pour Series II plant—but now with a new name ("Peak Magnum") misleadingly suggesting that Peak developed the plant. And, as defendants admit in their discovery responses and in several offers to potential purchasers, Peak continues to incorporate the Licensed Rights in virtually all of its offerings, including the patented chemical metering system and several other proprietary features developed by Port-a-Pour—without compensation to Port-a-Pour of any kind.

Peak's representation to the court that "there's nothing to enjoin" was demonstrably false, and has apparently been abandoned. Peak's new position, as sketched out in its Answer and its discovery responses—and which ignores the fact that Peak happily manufactured 15 plants that it sold for over $2 million between 2006 and 2010 under the License Agreement—is that Peak never received any valuable or usable technology from Port-a-Pour in the first place, that the patents Peak licensed were never valid, that, in essence, Peak invented all of Port-a-Pour's technology themselves, and that Peak is free to use Port-a-Pour's trademark because Port-a-Pour "abandoned" it.

In sum, despite Peak's assurances to the court and Port-a-Pour that "there is nothing to enjoin," this is not the case. Peak's new position—that Port-a-Pour has no rights to enforce—does not withstand scrutiny, particularly since Peak used the Licensed Rights for *four years*, without complaint, and to its considerable financial benefit. Now Peak has apparently decided it is much more lucrative to use the Licensed Rights without having to pay the license fee to the owner. A preliminary injunction is warranted to prevent defendants' continued misappropriation and infringement of Port-a-Pour's intellectual property to Port-a-Pour's detriment and to Peak's improper profit.

## MOTION

Pursuant to FRCP 65(a), 35 U.S.C. § 283, 15 U.S.C. § 1116(a), and CRS §7-74-103, Port-a-Pour requests a preliminary injunction enjoining Peak, its officers, directors, employees, agents, representatives, and anyone in privity with any of the foregoing from (a) the continued registration and use of the URL www.portapour.com and www.port-a-pour.com; (b) the use of any of the Licensed Rights for the manufacture or sale of any product; and (c) the use, distribution, or disclosure to any person any of the Licensed Rights. In support of its motion, Port-a-Pour relies on the Second Declarations of Jerome J. Doherty and Neil G. Oberg filed herewith ("2d Doherty Dec.," "2d Oberg Dec."), defendants' discovery responses (attached to the 2d Doherty Dec. as Exhibit A), defendants' Answer [Doc. #28], Plaintiff's TRO motion and supporting declarations [Doc. #7, 8], the record from the hearing on the TRO motion [Doc. #25], and the argument and authority below.

## STATEMENT OF FACTS

Plaintiff refers the court to the First Amended Complaint [Doc. #23] and the motion for temporary restraining order [Doc. #7, 8], which contain a detailed statement of relevant facts, and which are incorporated by this reference. The following are the material facts that have occurred since the TRO hearing, as well as a summary of the evidence that demonstrate that a preliminary injunction is warranted.

- In September, 2013, Peak once again completely revamped its website, which had been stripped down to a bare minimum immediately prior to the TRO hearing.
- Peak now offers on its website a plant called the "Peak Magnum," which is nothing more than a reconfiguration of the material-handling components of the Port-a-Pour Series II. 2d Oberg Dec. ¶16 and Exh. 2.
- Peak states that "every product offered for sale by Peak Innovations is listed on Peak's website." Response to Interrog. No. 2 (2d Doherty Dec. Exh. A). A Port-a-Pour plant is depicted on Peak's website. This indicates that Peak continues to offer a Port-a-Pour Series II plant for sale, in direct infringement of the '904 Patent. 2d Oberg Decl. ¶¶13-14 and Exh. 2.
- In August, 2013, Peak's website featured a photograph of the inside of its chemical metering system. 2d Oberg Dec. ¶15 and Exh. 2. That photograph was removed from the website in September. However, defendants' discovery responses and Answer reveal that Peak continues to sell numerous products with the chemical metering system. *See, e.g.,* Response to Interrog. No. 3 (2d Doherty Dec. Exh. A). Documents produced by Peak as well as their discovery responses demonstrate that Peak's chemical metering system directly infringes the '886 Patent. 2d Doherty Dec. ¶4.
- Peak's discovery responses indicate that Peak continues to sell products with air slides and horizontal dust filters. (Peak refused to provide responses regarding other disputed technologies.) The technical data provided by Peak demonstrates that the air slides and horizontal dust filters are Port-a-Pour's designs, licensed to Peak under the License Agreement. Peak's continued use of these designs infringes on Port-a-Pour's trade secrets and violates the parties' contracts. 2d Doherty Dec. ¶¶6-7 and Exh. A; *see generally* 2d Oberg Dec. and Exhibits.
- Peak issued several offers to sell concrete batch plants and related equipment over the summer. Those offers, together with defendants' discovery responses and Answer, demonstrate that Peak continues to offer for sale various products incorporating (or directly counterfeiting) Port-a-Pour's proprietary, patented

      Licensed Rights. 2d Doherty Dec. ¶8 and Exh. B; *see generally* 2d Oberg Dec. and Exhibits.

- Peak has stopped overtly using Port-a-Pour's trademark. However, Peak continues to show products that are various configuration of Port-a-Pour proprietary technologies. Further, while Peak no longer uses www.portapour.com or www.port-a-pour.com to redirect traffic to its own site, it continues to maintain the registration to those sites, which blocks traffic to Port-a-Pour's site and gives the misleading impression that Port-a-Pour no longer exists. 2d Doherty Dec. ¶15 and Exh. C.

## LEGAL STANDARD

"A preliminary injunction may issue if the movant clearly shows: (1) a substantial likelihood of success on the merits; (2) irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm the preliminary injunction will cause the opposing party; and (4) the preliminary injunction is not adverse to the public interest." *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F.Supp.2d 1216, 1221 (D. Colo. 2001) (hereafter, *"Bigfoot"*) (citing *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991). The moving party has the burden of making a *prima facie* showing of a probable right to the ultimate relieve and a probable danger of injury if the motion is denied. *Bigfoot*, 167 F.Supp.2d at 1221.

## ARGUMENT

A preliminary injunctive relief is appropriate in this case because Port-a-Pour satisfies all four elements of the applicable test set forth above. Indeed, without injunctive relief Peak will continue to improperly profit from its illegal offerings of Port-a-Pour's protected intellectual property, to the irreparable detriment of its rightful owner.

Unlike some intellectual property cases, in this case Peak illegally infringes not on just one element of Port-a-Pour's intellectual property, but has, in effect, co-opted Port-a-Pour's designs, trade secrets and its patents—all of which Peak uses for its own profit and to plaintiff's irreparable injury. Peak also retains ownership of URLs that infringe on Port-a-Pour's registered

trademark, and not only prevents Port-a-Pour from using those URLs for its own benefit, but also gives the false impression that Port-a-Pour is not in business because the URLs return error codes instead of a functioning website. Because the different types of intellectual property carry different presumptions and tests, the different claims are addressed separately. However, Port-a-Pour moves for an injunction prohibiting any and all off Peak's activities using any component of Port-a-Pour's intellectual property rights, all of which are unauthorized and unlawful.

A. **PEAK'S INFRINGEMENT OF U.S. PATENT NO. 7,050,886 and 6,876,904 MUST BE ENJOINED UNDER 35 U.S.C. § 283.**

Likewise, Port-a-Pour clearly satisfies the four factors required for preliminary injunctive relief with respect to Peak's ongoing infringement of the U.S. Patent No. 7,050,886 and 6,876,904 (the "'886 Patent" and the "'904 Patent," respectively; collectively, the "Patents").

First, Port-a-Pour establishes a strong likelihood of success on the merits. "To demonstrate a likelihood of success on its patent infringement claim, [plaintiff] must show that the [] patent is valid and that it is likely to prove that [defendant] is infringing it." *Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1304 (D. Utah 2008).

The '886 Patent is valid as evidenced by the First Declaration of Neil Oberg [Doc. #8] and its first exhibit, namely, the '886 Patent. *See* First Oberg Decl. [Doc. #8] ¶¶3-4 and Exh. A ('886 Patent) (filed with TRO motion). It is equally clear that Peak is infringing the '886 Patent. *See* First Oberg Decl. [Doc. #8] ¶¶6-12 and Exhs. A ('886 Patent) and B (photographs of infringing activities).

The '904 Patent is also valid as evidenced by the Second Declaration of Neil Oberg (filed herewith) and the patent itself (attached to the First Amended Complaint). Likewise, the

Declaration of Neil Oberg establishes Peak's infringement on the '904 Patent. *See* 2d Oberg Dec. ¶¶7-11 and Exh. 1 thereto.

As set forth in the two Oberg Declarations, based on photographs and Oberg's analysis of such photographs, Peak has never ceased using the patented chemical dispensing system originally licensed to Peak under the Licensing Agreement, and continues to incorporate such system on its products. *See* 2d Oberg Decl. ¶¶6-12 and Exh. B (photographs). The chemical metering system in place on Peak's "Peak-Max" systems, its symmetry oil field equipment, and other systems is identical in appearance and observed functionality to the system covered by the '886 Patent.

Furthermore, Peak *admits* that it continues to offer the chemical metering system (2d Doherty Dec. ¶4 and Exh. 2), and that it has thought about modifying the chemical metering system but has not done so. *Id.*

The affirmative evidence presented by Port-a-Pour, together with the admissions of Peak, are sufficient to satisfy the element of likelihood of success for purposes of a preliminary injunction. "When considering a motion for preliminary injunctive relief in a patent infringement dispute, the court is not required to engage in a comprehensive and final claim construction." *Voile*, 551 F. Supp. 2d at 1304.

Finally, as the Oberg Declarations attest, the Peak systems infringe on every element of both patents. First Oberg Decl. [Doc. #8] ¶11; 2d Oberg Dec. ¶¶7-14 and Exh. 1. With this showing, Port-a-Pour satisfies the element of likelihood of success on the merits necessary for a preliminary injunction. *See Voile*, 551 F.Supp.2d at 1304 (showing that presence of every element or its substantial equivalence permits entry of preliminary injunction).

Second, Port-a-Pour establishes the threat of irreparable injury if the infringement is not enjoined. First Doherty Decl. [Doc. #7] at ¶¶30-31; 2d Doherty Decl. ¶¶16-17. As noted above, Peak's infringement harms Port-a-Pour not only by depriving Port-a-Pour of sales but by diminishing Port-a-Pour's market share and goodwill. *Id.*

Third, the balance of harm tilts in favor of Port-a-Pour, because any harm to Peak is discounted to the extent it is based on infringement, particularly since Peak has been on notice that its products infringe, and yet has taken no steps to develop different, non-infringing technologies. *Voile*, 551 F.Supp. 2d at 1308.

Fourth, in patent infringement claims, the public good favors the party that will likely prevail on the patent infringement claim. *Id.* That party is Port-a-Pour.

As a consequence, all of the elements for a preliminary injunction are satisfied, and an injunction against further infringement pursuant to 35 U.S.C. § 283.

**B.  PEAK'S UNAUTHORIZED AND ILLEGAL USE OF PORT-A-POUR'S TRADE SECRETS MUST BE ENJOINED UNDER CRS §7-74-103.**

Next, Port-a-Pour satisfies the factors for a preliminary injunction barring future violations of the Colorado Uniform Trade Secrets Act ("UTSA"), CRS §§7-74-101 *et seq.*

First, plaintiff demonstrates a likelihood of success on the merits.

[UTSA] defines a trade secret as:

[T]he whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value.

Colorado courts may consider several factors to make the factual determination of whether a trade secret exists under this statutory definition, including: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, such as the employees; (3) the

9

precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

The UTSA further provides:

To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

*Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 521-22 (Colo. App. 2011) (citations omitted).

Port-a-Pour's trade secrets are detailed in the two Oberg Declarations, which were filed under seal to protect those trade secrets, and will not be detailed in this filing for the same reason. Plaintiff respectfully refers the court to the First Oberg Declaration [Doc. #8] at ¶¶13-35 and the Second Oberg Declaration at ¶¶12-17 filed herewith for the identification and explanation of the trade secrets and Peak's misappropriation and use thereof.

Here, while the *Saturn* factors are satisfied as demonstrated in the Oberg Declarations, in addition Peak and Nelson explicitly agree that the information provided by Port-a-Pour constitutes Port-a-Pour's trade secrets. *See* First Doherty Decl. [Doc. #7] ¶¶5-7 and Exhs. A, B and C (confidentiality agreement, licensing agreement). Specifically, Nelson and Peak agree that

> It is anticipated that the information will include details which are proprietary to, and trade secrets of, Port-A-Pour pertaining to Port-A-Pour's business, patent and intellectual property, business plans, and financial matters. It is expressly understood and agreed by Recipient that such information is owned by and proprietary to Port-A-Pour, **that such information is maintained as confidential, and shall be deemed the trade secrets of Port-A-Pour, which shall not be disclosed to any third party under any circumstance, <u>or used to create any competing business entity, products or consulting services</u>, except with the written consent of Port-A-Pour**.

Confidentiality Agreement (emphasis added), First Doherty Decl. [Doc. #7] Exhs. A and C. This agreement is dispositive, and bars any defense that the Licensed Rights are not trade secrets.

In addition, however, Port-a-Pour's specific designs and processes described in the Oberg Declarations are trade secrets under the *Saturn* definition, because (a) the information, in its application to concrete batch plants, is not known outside Port-a-Pour; (b) is kept confidential within the business, with access to such information limited to those employees with a need to know and with instructions to maintain the confidentiality of such information; (c) constitutes Port-a-Pour's primary competitive advantage vis-à-vis competitors, and provides Port-a-Pour with a unique product since no competitors (except Peak, through violation of UTSA) has any competing products with the features offered by Port-a-Pour; (d) was developed over a period in excess of 20 years at a cost of over $1,000,000; and (e) would require similar investments of time and money to develop independently. First Doherty Decl. [Doc. #7] ¶¶4, 29-31; First Oberg Decl. [Doc. #8] ¶¶13-35.

Further, Port-a-Pour clearly establishes misappropriation of its trade secrets by Peak. "Under the UTSA, 'misappropriation' is defined in pertinent part as the '[a]cquisition of a trade secret of another **by a person who knows or has reason to know that the trade secret was acquired by improper means**.' § 7–74–102(2)(a), C.R.S. 2010. 'Improper means' includes theft, bribery, misrepresentation, **breach or inducement of a breach of a duty to maintain secrecy**, or espionage through electronic or other means." Id. at § 7–74–102(1), C.R.S. 2010." *Saturn*, 252 P.3d at 525 (emphasis added).

Here, it is established that Nelson and Peak acquired and continue to use each and every element of Port-a-Pour's trade secrets in breach of their explicit obligation to maintain

confidentiality and not use such trade secrets. First Doherty Decl. [Doc. #7] ¶¶5-7 and Exhs. A, C; First Oberg Decl. [Doc. #8] ¶¶13-35; Confidentiality Agr. (First Doherty Decl. [Doc. #7] Exhs. A, C) at p. 1. Indeed, as Peak explicitly agreed, "In the event of termination by Licensor, then all rights of Peak shall immediately be terminated and the license rights granted to Licensee shall immediately and completely revert to Licensor and Licensee will have no further rights under this Agreement except as may be expressly provided herein." License Agreement (First Doherty Decl. [Doc. #7] Exh. B) at ¶4.01(a). Peak explicitly confirmed the termination of the License Agreement. First Doherty Decl. [Doc. #7] ¶11 and Exh. H.

Second, Port-a-Pour establishes the threat of irreparable injury if the misappropriation is not enjoined. As noted above, Peak's misappropriation harms Port-a-Pour because sales of Port-a-Pour's systems incorporating the misappropriated trade secrets without compensation harms Port-a-Pour financially. First Doherty Decl. [Doc. #7] ¶24. In addition, however, Nelson and Peak have already demonstrated a willingness to misappropriate Port-a-Pour's IP Rights, and plaintiff believes Peak will not hesitate to disclose Port-a-Pour's trade secrets or otherwise violate the requirements of the Confidentiality Agreement. *Id.* ¶31.

Third, the balance of harms tilts in favor of Port-a-Pour, because any harm to Peak is discounted to the extent it is based on misappropriation, particularly since Peak has been on notice that has no right to continue to use the misappropriated trade secrets, and yet has taken no steps to develop different, non-infringing technologies.

Fourth, the public good favors the protection of Port-a-Pour's trade secrets.

C. PEAK'S USE OF THE "PORT-A-POUR" MARK AND THE WWW.PORTAPOUR.COM AND WWW.PORT-A-POUR.COM URLS MUST BE ENJOINED UNDER THE LANHAM ACT.

Port-a-Pour clearly satisfies the four factors required for preliminary injunctive relief with respect to Peak's unauthorized use of Port-a-Pour's registered mark and the URLs www.portapour.com and www.port-a-pour.com.

First, Port-a-Pour easily establishes likelihood of success on the merits. "To prove infringement, the moving party must show: (1) the mark is validly registered; (2) defendants' use of the mark was unauthorized; and (3) defendants' use is likely to cause confusion in the market place concerning the source or quality of the products." *Bigfoot*, 167 F. Supp. 2d at 1222.

Port-a-Pour has obtained for its "Port-a-Pour" trademark U.S. Trademark Registration No. 3,070,009, International Class ("IC") and U.S. Class 013, 019, 021, 023, 031, 034 and 035 for use in connection with a concrete batch mixing machine (the "Mark"). First Doherty Decl. [Doc. #7] ¶19. The mark was registered over 10 years ago and has become uncontestable. First Doherty Decl. [Doc. #7] ¶19. The Mark is famous within the meaning of the Lanham Act.

While Peak no longer overtly uses the mark, it continues to infringe on the trademark by maintaining its registration of the URLs of the registered trademark "Port-a-Pour," namely, "www.portapour.com" and "www.port-a-pour.com." 2d Doherty Decl. ¶15 and Exh. C. Further, as demonstrated by Peak's Answer and discovery responses, Peak now takes the position that it is entitled to use Port-a-Pour's trademark because it has been "abandoned." Answer [Doc #28] at ¶¶72-76. This explains why Peak has not released its registration of the URLs—it hopes to retain them for its own use, and to prevent Port-a-Pour from using them in the meantime.

Peak's use of the URLs for any purpose—including preventing Port-a-Pour from using them and/or creating the false impression that Port-a-Pour does not exist—is without authorization. While Peak was previously authorized to use the Mark by virtue of the License Agreement, the License Agreement terminated in July, 2010, and required the completion of all works-in-progress by no later than July, 2011. First Doherty Decl. [Doc. #7] ¶¶10-12, 15 and accompanying Exhibits.

Based on the foregoing, Plaintiff clearly demonstrates a likelihood of success on the merits of its claim of Peak's unauthorized use of the URL www.portapour.com pursuant to the Cyberpiracy Prevention provisions of the Lanham Act, 15 U.S.C. §1125(d).

Second, "In trademark cases, irreparable injury is ordinarily presumed once the plaintiff has established a likelihood of confusion." *Bigfoot*, 167 F.Supp.2d at 1226. As demonstrated above, Peak continues to depict Port-a-Pour equipment in an effort to pass it off as its own, or to offer counterfeit products. *See generally* 2d Oberg Decl. and Exhs. 1 and 2. In addition, however, the Doherty Declaration establishes immediate and irreparable harm that has occurred and that will continue to occur unless Peak is enjoined, because Port-a-Pour is deprived of sales and goodwill. First Doherty Decl. [Doc. #7] ¶24. With the evidence of irreparable harm, there is no doubt that this factor weighs in plaintiff's favor.

Third, the threatened injury of continued infringement outweighs any potential harm to Peak. Since Peak claims it is no longer overtly using the "Port-a-Pour" mark (Answer [Doc #28] ¶51), Peak cannot claim any potential harm arising from an injunction against further use of Port-a-Pour's Trademark. While Peak might suffer actual harm to its ongoing use of Port-a-Pour's intellectual property, the court should heavily discount this "harm," since Peak's business is

based on the illegitimate and wrongful use of Port-a-Pour's lawful rights. At the time the License Agreement terminated, the legal authority for Peak to continue to use the Licensed Rights terminated right along with it. If Peak had invested in researching and developing its own technologies and products, without infringing on Port-a-Pour's rights, Peak could have avoided potential harm by operating a business that generates income from non-infringing activities. *See Bigfoot*, 167 F.Supp.2d at 1127 (defendant who knew of trademark infringement but took no corrective action should not be heard to complain of expenses that could have been avoided). This court should not condone infringement of intellectual property rights by giving weight to the loss of infringement-based income.

Fourth, the public interest is served by enjoining the further confusion of the public. This court stated the matter succinctly in *Bigfoot* as follows:

> Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused. Having established a likelihood of consumer confusion created by the concurrent use of the Bigfoot marks, it follows that if such use continues, the public interest would be damaged. Conversely, a prohibition upon Defendants use of the mark would eliminate that confusion. I therefore conclude that a preliminary injunction is in the public interest.

*Bigfoot*, 167 F. Supp. 2d at 1228 (quotation marks and citations omitted).

The same analysis applies in this case, with the same result.

For the foregoing reasons, all the factors for a preliminary injunction against Peak's use of the Port-a-Pour Mark in any products, materials, or in any way in connection with any of its products is warranted pursuant to 15 U.S.C. §1114(b) and 15 U.S.C. §1125(a), as is a preliminary injunction against Peak's use of the URL www.portapour.com and www.port-a-pour.com pursuant to 15 U.S.C. §1125(d).

## CONCLUSION

For the foregoing reasons, plaintiff respectfully moves for a preliminary injunction prohibiting Peak, Nelson, and their respective officers, agents, subsidiaries, employees, and those in privity with or that act in concert with any of the foregoing, from further (a) activities that constitute infringement of United States Trademark No. 3,070,009, and from (i) manufacturing, distributing, offering for sale, holding for sale or advertising any products, merchandise or goods bearing the name or trademark of Plaintiff or any colorable variation or imitation thereof, and (ii) representing that any products, merchandise or goods manufactured, distributed, sold, held for sale or advertised by them is authorized by Plaintiff in this district or in any other district in which Plaintiff seeks to enforce this Court's injunctive order; (b) use of the URL www.portapour.com or www.port-a-pour.com (and requiring Peak to assign the same to Port-a-Pour); (c) activities that constitute infringement of United States Patent No. 7,050,886; (d) activities that constitute infringement of United States Patent No. 6,876,904; (e) activities that constitute misappropriation of Port-a-Pour's trade secrets; (f) offering, manufacturing, selling, marketing, advertising, or distributing any product including or involving any trade secret identified in the Oberg Declaration or United States Patents No. 7,050,886 or 6,876,904; and (g) using, disseminating, distributing or disclosing of any information constituting any of the trade secrets identified in the First Oberg Declaration [Doc. #8].

Plaintiff further requests the court to set a reasonable bond in accordance with FRCP 65(c), keeping in mind the egregious and willful nature of defendants' infringement and misappropriation of rights acknowledged by defendants to be the exclusive intellectual property rights of plaintiff, as well as defendants' misrepresentation to this Court that it is no longer using

any of Port-a-Pour's Licensed Rights and that therefore there was "nothing to enjoin." Further, because of the difficulty in obtaining bonds in today's restricted credit environment, plaintiff respectfully requests that the court separate the bond requirements as to the injunction against further trademark infringement, further patent infringement, and further misappropriation of trade secrets. In particular, plaintiff requests the imposition of a nominal bond requirement for injunction against future trademark infringement and disclosure of plaintiff's trade secrets, so as to permit plaintiff to satisfy the bond requirement immediately with the deposit of cash into the court's registry.

DATED:   October 25, 2013

Respectfully Submitted,

DANIEL J. CULHANE LLC

By:   s/ Daniel J. Culhane
Daniel J. Culhane
1600 Broadway, Suite 1400
Denver, Colorado 80202
Telephone:  (303) 945-2070
Fax:  (720) 420-5998
Dan@CulhaneLaw.com
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that on October 25, 2013, I served a copy of the foregoing Motion for Preliminary Injunction, together with (a) the Second Declaration of Jerome J. Doherty and all exhibits thereto; (b) the Second Declaration of Neil G. Oberg and all exhibits thereto (filed under seal, via on defendants' counsel of record via electronic service.

s/ Daniel J. Culhane