IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   13-cv-01511-WYD-BNB

PORT-A-POUR, INC., a Colorado corporation,

Plaintiff,

v.

PEAK INNOVATIONS, INC., a Colorado corporation, and
MARK E. NELSON, an individual

Defendants and Counter Claim Plaintiffs

v.

PORT-A-POUR, INC. a Colorado corporation;
JEROME J. DOHERTY; and
NEIL G. OBERG, individuals,

Counter Claim Defendants.

_____

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

_____

I.   <u>INTRODUCTION</u>

THIS MATTER comes before the Court on Plaintiff's Motion for Preliminary

Injunction [the "preliminary injunction motion" or the "motion"] filed on October 25, 2013.

(ECF No. 35.)  The Court has reviewed Plaintiff's motion and the Declarations in

support thereof (ECF Nos. 35:1-8, 36), Defendants' response filed November 8, 2013

(ECF No. 44), and Plaintiff's reply filed December 6, 2014 (ECF No. 50).

The Court conducted an evidentiary hearing on the motion on January 8, 13 and

14, 2014.  The Court heard testimony from Neil Oberg and Jerome Doherty for Plaintiff

Port-a-Pour, Inc. ["Port-a-Pour"] and from Mark Nelson for the Defendants.  The Court

refers to the exhibits received in evidence at the hearing by number, and to the transcripts by the abbreviation "Tr."  The parties submitted proposed findings of fact and conclusions of law on March 6, 2014 (ECF Nos. 72 and 73).  Additionally, a "Notice of Supplemental Authority in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction" (ECF No. 44) was filed on May 29, 2014.  Transcripts of the evidentiary hearing were filed on February 24 and May 8, 2014 (ECF Nos. 69-71, 98).

By way of background, Port-a-Pour is in the concrete business and claims that it spent over 20 years developing proprietary designs for equipment that it sold in the industry, including a portable low-profile concrete batch plant known as the "Series II" that is at issue in this litigation.  Port-a-Pour has two U.S. Patents and a U.S. Trademark regarding its products.  It licensed its designs, patents and the "Port-a-Pour" trademark to Defendant Peak Innovations, Inc. ["Peak"] under agreements that its intellectual property rights and trade secrets are proprietary and exclusively owned by Port-a-Pour. The agreements provided that Peak's sole right to use Port-a-Pour's intellectual property and trade secrets derived from the license, and upon the termination of the license Peak must immediately cease all further use of such rights and return all of Port-a-Pour's designs, specifications and other proprietary information.

Port-a-Pour claims that after it terminated the license agreement, Peak usurped Port-a-Pour's rights and continued to use them for its own benefit, in derogation of the license, the parties' agreements, and Port-a-Pour's legally protected intellectual property rights.  Port-a-Pour seeks to enjoin Peak's illegal use of its rights.  The Amended Complaint alleges claims of Patent Infringement, Violation of the Lanham Act, Infringement of Registered Trademark, Violation of the Cyberpiracy Prevention

Provisions of the Lanham Act, Misuse of Protected information in Violation of Colorado Uniform Trade Secrets Act, Breach of Licensing Agreement, Breach of First and Second Confidentiality Agreements, and Civil Conspiracy.

II.   <u>FINDINGS OF FACT</u>

1.   Port-a-Pour is a Colorado corporation headquartered in Berthoud, Colorado. Beginning in approximately 1984, Port-a-Pour began developing machinery used for producing large quantities of concrete for construction projects.  Over the ensuing 22 years, Port-a-Pour refined its products and technologies.

2.   Port-a-Pour's designs are protected by two patents (U.S. Patent No. 6,876,904—the "904 Patent"— and U.S. Patent No. 7,050,886—the "886 Patent"), each of which relate to a chemical metering system for use with concrete batch plants (also referred to as the chemical admixture or admix system).  (Exs. 1, 2).  Port-a-Pour also received U.S. Trademark Registration No. 3,070,009, International Class and U.S. Class 013, 019, 021, 023, 031, 034, 035, for the name "Port-a-Pour" for use in connection with a concrete batch mixing machine (the "Trademark").  (Ex. 9).  The Patents and Trademarks were duly and validly issued by the United States Patent and Trademark Office.

3.   Port-a-Pour claims to have combined several technologies and elements into its line of products to create a portable concrete batch plant, *i.e.*, a plant capable of producing large quantities of high-grade concrete, along with supporting plant equipment.  Port-a-Pour's Series II concrete batch plant consists of a single trailer with (a) a powder silo or cement bin (for cement), (b) two aggregate bins for crushed rock and sand, (c) a twin shaft blender that blends the dry ingredients, (d) a chemical

metering system, and (e) a computer system with custom software to control all of the components.  (Tr. 18:15-20:15; 27:15-18; 33:3-34:25; 51:17-23.)

4.  Port-a-Pour's product line also includes a standalone horizontal powder silo built onto its own separate trailer, which is used if the desired mix design requires fly ash as well as cement powder [the "Auxiliary Silo"].  (Tr. 26:1-28:23.)  Neil Oberg of Port-a-Pour testified that the Auxiliary Silo was developed in response to a new industry requirement for a second fly ash (as opposed to cement) powder to be incorporated into concrete batch mixes.  (*Id.* 28:8-21.)  Mark Nelson of Peak also testified that this was the reason that a horizontal silo such as the Auxiliary Silo was necessary.  (*Id.* 261:19-24.)  The Auxiliary Silo functions exactly the same as the powder silo (cement bin) built onto the plant, and integrates into the plant's computer control system.  (*Id.* 27:21-24.)  Nevertheless, Mr. Nelson maintains that the Auxiliary Silo and the Series II are separate and distinct products.  (*Id.* 355:21-356:5.)

5.  Mr. Oberg testified on behalf of Port-a-Pour that the components of the Auxiliary Silo, including the weighing system, the Airslide, and the low-profile dust filter, make it "extremely portable so there's really no dismantling of any components to move it from one site to the next.  It's designed to be moved and set up relatively quickly."  (Tr. 30:16-19.)  He also testified that the Auxiliary Silo is low-profile as it does not require a crane for set up.  It is portable because it is on a set of wheels, and is typically hauled with a semi-tractor.  (*Id.* 29:4-10.)  It has a low-profile dust filter, which is a Port-a-Pour development, and it also has Airslides (in the example he testified to there were two Airslides, one on the front and one to the rear with a butterfly valve which is typically an automatic butterfly valve in the center).  (*Id.* 29:11-15.)

6.  Mr. Oberg testified that Port-a-Pour developed the low-profile dust filter out of necessity to gain extra volume, as the commercial dust filters that were used were built on the back of the plant and reduced storage volume.  (Tr. 45:6-20.)  The Airslide is the delivery mechanism, and it is high volume air under relatively low pressure.  (*Id.* 29:16-17.)  That was another innovation by Port-a-Pour, as other plants were not using Airslides in their portable plants.  (*Id.* 46:1-7.)  The Airslide went through several iterations by design, as Port-a-Pour wanted its angle to be "sharp" enough that there was adequate free fall of the material.  (*Id.* 49:12-51:15.)  It is designed to meter out cement and/or fly ash.  It works in conjunction with an auger, and is set up on load cells (electronic weighing instruments).  (*Id.* 29:16-25.)  This allows control of the cement delivery and the ability to measure the cement by decumulation.  (*Id.* 46:18-23.)

7.  Port-a-Pour developed the design and components of the Series II batch plant and the Auxiliary Silo, according to Mr. Oberg, and he testified that these are propriety. (Tr. 29:11-12; 30:13-32:5; 34:16-35:15; 45:8-54:15.)  He also stated that the importance of the Series II over earlier iterations "was that it had higher capabilities for delivery, meaning it was more productive", it "had larger blender sizes" and "a little larger Airslide and butterfly control so we could deliver a little more cement in a shorter period of time", it had "a little better blending control" over dry power with the aggregates, it was "a more open" and a "more serviceable" plant, and "[i]t was higher off the ground so if there was spillage it was easier to clean around the plant."  (*Id.* 56:2-16.)

8.  Defendants presented evidence, however, that the functional components of concrete batch plants and horizontal silos are widely known in the marketplace.  For example, belt or delivery conveyors are used in portable concrete batch plants and

other industries, and there is nothing novel or secret about them.  (Tr. 125:24-126:3;

159:4-160:11.)  Airslides also are not a novel way to discharge a bin, and are used in

cement plants to remove powders and cements.  (*Id.* 140:16-141:21; 151:3-16; *see also*

141:1-144:9.)  An Airslide to discharge a horizontal bin is not a novel application, as

Defendants presented evidence that the Fuller Airslide trailer uses this configuration.

(*Id.* 145:9-19.)  Likewise, there are other manufacturers of chemical admixture systems

for concrete batch plants, although Mr. Oberg testified that such systems are unusual.

(*Id.* 114:8-19.)  Butterfly valves are not novel.  (*Id.* 157:18-25.)  There are many

manufacturers of aggregate bins, and it is not a novel concept.  (*Id.* 134:9-135:2.)

Decumulative weighing of aggregate bins is not a novel concept.  (*Id.* 134:12-14.)

Horizontal dust filters are not unique in technology, including the pulse-jet type filters

manufactured by Port-a-Pour, and are available on the market.  (*Id.* 161:8-162:6.)

    9.  Port-a-Pour does not claim that every blender for a concrete batch plant,

every conveyor for a concrete batch plant, every load cell for a concrete batch plant,

every horizontal filter for a concrete batch plant, every horizontal silo for a concrete

batch plant, every horizontal silo using an air slide as a way to empty it, and every

admixture system for a concrete batch plant is using its proprietary information.  (Tr.

162:10-163:16.)  It also does not claim that every horizontal powder bin infringes its

patent, that every portable concrete batch plant infringes its patent or violates its trade

secrets, that every horizontal bin violates its trade secrets, or that every chemical

admixture system violates its trade secrets.  (*Id.* 250:10-251:1.)

    10.  In April 2006, Port-a-Pour entered into agreements with Defendants Peak

and Mark Nelson.  Mr. Nelson is the president and sole shareholder of Peak.  Pursuant

to a Licensing Agreement executed on April 14, 2006 (Ex. 3), Peak agreed to pay

annual fees to license the right to manufacture and sell Port-a-Pour's products.

11.   Mr. Oberg testified that the products Peak was licensed to manufacture and

sell under the License Agreement were Port-a-Pour's Series II batch plant and auxiliary

optional equipment.  (Tr. 8:23-25.)  Consistent with this, the Licensing Agreement stated

in section 2.01 that "Licensor hereby grants Licensee the indivisible, and non-assignable

. . . right and license to make, use, sell and assemble Agreement Products in the

designated territory."  (Ex. 3.) On page one of the Agreement, "Agreement Product" or

"Products" are defined as "a portable batch plant for making concrete, and plant support

equipment."  (*Id.*; *see also* Tr. 9:3-23.)  Section 1.01 of the Agreement defines

"Agreement Products" more broadly, as "any product in which Port-a-Pour has a

protected proprietary interest, including without limitation, any product disclosed in trade

secrets or other information disclosed to Peak, specifically including trade secrets and

proprietary information contained in the Confidentiality and Non-Disclosure Agreement .

. . . ."  (Ex. 3.)  Section 1.02 defines the term "trade secrets" as:

> all that information, drawings, data, architectural specifications and the like
> (herein collectively called "information") known from time to time by
> Licensor relevant to the manufacture, use, sale, and assembly of a mobile
> concrete batch plant, including all information, drawings, data, software,
> source code, design specifications, wiring diagrams, blending systems,
> and other specifications related to Agreement Products, which is
> contemplated to be transferred to Licensee by Licensor in order to enable
> licensee to manufacture, use, sell, and assemble the mobile concrete
> batch plant.

(*Id.*)  It is undisputed that the mobile concrete batch plant referred to in Section 1.02 is

Port-a-Pour's Series II plant.  (Tr. 102:23-103:15.)

12.   While Defendants assert that the products subject to the Agreement did not include the Auxiliary Silo (*see* Mr. Nelson's testimony at Tr. 364: 8-11), Mr. Doherty testified that the Auxiliary Silo is subject to the Agreement as "plant-supported equipment".  (Tr. 225:25-226:6.)

13.   The parties also executed confidentiality agreements.  In the Confidentiality and Non-Disclosure Agreement executed on April 13, 2006, Peak and Mr. Nelson agreed not to disclose or misuse Port-a-Pour's proprietary information or its trade secrets "pertaining to Port-a-Pour's business, patent and intellectual property, business plans, and financial matters" except as permitted under the Agreement.  (Ex. 4.)  "It is expressly understood and agreed by Recipient that such information is owned by and proprietary to Port-a-Pour, that such information is maintained as confidential, and shall be deemed the trade secrets of Port-a-Pour, which shall not be disclosed to any third party under any circumstance, or used to create any competing business entity, products or consulting services, except with the separate written consent of Port-a-Pour."  (*Id.*)  It defined "Agreement Products" and/or "Protected Information" as "all information which is proprietary to, and trade secrets of, Port-a-Pour pertaining to a portable concrete batch plant and plant support equipment, specifically including any and all patents issued or pending to Port-a-Pour and all other trade secrets disclosed by Port-a-Pour to Recipient relating to the portable concrete batch plant and plant support equipment."  (*Id.*)  On July 18, 2007, a second Confidentiality and Non-Disclosure Agreement was executed containing identical terms to the first one.  (*Id.*)

14.   Neil Oberg produced drawings and specifications for the concrete batch plant and Auxiliary Silo, which were in existence prior to the time the license was

-8-

entered into with Peak.  (Tr. 26:1-23; 27:8-12; 36:2-24).   Drawings were produced in a

format known as AutoCAD, which is a computer-aided design format widely used in

industry.  (*Id.* 17:14-18:4.)  Port-a-Pour used the AutoCAD drawings to build a batch

plant and Auxiliary Silo in Berthoud, Colorado that was operating at the time that Port-a-

Pour was having discussions with Peak.  (*Id.* 32:6-24; 104:25-105:3.)

15.   The drawings were provided to Peak as required per the Licensing

Agreement, and Mr. Oberg testified that the drawings contained the materials and

measurements necessary to fabricate a plant.  (Tr. 21:23-22:12; 24:14-25:17; 104:19-

24.)[1]  The drawings were not manufacturing drawings, however, and Mr. Oberg stated

that more detail was required to manufacture a plant.  Mr. Nelson acknowledges that he

was told by Port-a-Pour that the drawings were not complete enough to be considered

manufacturing drawings.  (*Id.* 328:9-14.)  Mr. Oberg stated that whatever details were

missing from the drawings, Port-a-Pour was there to answer questions to support Peak

in its manufacturing efforts and to provide technical assistance, per the Licensing

Agreement.  (*Id.* 23:8-20.)  For example, Mr. Oberg testified that while the drawings did

not have technical information for the Airslides or specifications for motors, wiring and

other things, he would have given that information to Peak.  (*Id.* 110:1-21.)

16.   Mr. Doherty testified as to the measures that Port-a-Pour takes to keep its

drawings and specifications confidential; namely, the AutoCAD drawings discussed by

Mr. Oberg in his testimony.  (Tr. 186:5-188:1.)  Port-a-Pour keeps the drawings in a

locked office and only Mr. Oberg and Mr. Doherty have access to that office.  (*Id.* 188:2-

---

[1] Port-a-Pour did not give drawings to Peak for the Auxiliary Silo until later on in the relationship, because Peak's first plant did not require such a silo.  (*Id.* 26:24-27:7.)

7.)  While the drawings are on Mr. Oberg's computer, he keeps the computer with him and it is password protected.  (*Id.* 188:8-15.)  Mr. Doherty testified that this information has been released to outsiders only twice (one of which was to Peak), and on both occasions under confidentiality agreements or nondisclosure agreements.  (*Id.* 189:2-20).  Other employees, such as the fabricators who build the machines, receive drawings on a need-to-know basis, *i.e.*, a single drawing to build the specific subassembly.  (*Id.* 188:7-23.)  Once that subassembly is complete, the drawing is destroyed.  (*Id.* 188:24-189:1.)

17.  However, Port-a-Pour began transferring the AutoCAD drawings related to the Series II batch plant prior to the time the Licensing Agreement went into effect with Peak.  (Tr. 101:11-19; 105:9-11; 108:3-7; 257:2-258:1.)  Mr. Nelson testified that Peak got its first information from Port-a-Pour in December 2005 or January 2006.  (*Id.*, 257:2-6.)  Indeed, Peak began building a Series II plant prior to the signing of the Licensing Agreement.  (*Id.* 103:26-104:5.)  Mr. Doherty testified that at the time Port-a-Pour provided the drawings to Peak, it had an "understanding in principle" about the confidentiality of the drawings; namely, that Port-a-Pour would let Peak and Mr. Nelson see the drawings and work with them until they had a signed agreement.  (*Id.* 193:7-13.)  He further testified that Exhibit 4, the Confidentiality and Nondisclosure Agreement dated April 13, 2006, is the agreement that was eventually signed to memorialize that agreement.  (*Id.* 193:14-18.)

18.  Mr. Doherty testified that during the term of the Licensing Agreement, Peak built and sold 15 Port-a-Pour Series II batch plants and approximately seven Auxiliary Silos of various sizes, which were all branded with the Port-a-Pour Trademark.  (Tr.

194:19-194:11.)  He also testified that when Peak was learning to build Port-a-Pour's products, Mr. Oberg worked with it almost every day for several months.  (*Id.* 195:19-24.)  Peak generated approximately $4-4.5 million of revenue from sales of Port-a-Pour's products, and paid licensing fees of approximately $340,000.00.  (*Id.* 195:12-15; Ex. 28.)

19.  By July 2010, Peak had fallen behind in paying licensing fees and Port-a-Pour terminated the Licensing Agreement.  (Exs. 28, 29.)  Mr. Nelson, in his capacity as President of Peak, wrote a letter stating "I acknowledge your termination of the Licensing Agreement" and "we will no longer promote or build the Series II."  (Ex. 30.) As of the time the Agreement was terminated, Mr. Doherty testified that Peak owed Port-a-Pour $222,434 in licensing fees.  (Tr. 196:23-197:2.)  Defendants dispute this.

20.  In connection with the termination of the Licensing Agreement, Port-a-Pour requested that Peak return the proprietary documents and information it had provided, as required by section 4.03 of the Licensing Agreement.  (Exs. 3, 31; Tr. 198:3-14.) Mr. Doherty testified that Peak did not return all of Port-a-Pour's proprietary documents after the Licensing Agreement's termination.  (Tr. 199:10-22.)  Mr. Nelson admitted that he did not return Port-a-Pour's drawings when the license terminated, and did not stop using the manufacturing drawings for the products Peak had made.  (*Id.* 339:7-340:3.) However, he also testified that Peak was not using the drawings anymore because it had stopped building the Series II plant.  (*Id.* 361:5-18.)

21.  Also, after the Licensing Agreement was terminated, Mr. Nelson admitted that Peak redirected the URL—www.Port-a-Pour.com—to its website, which continued until the TRO hearing in June 2013.  (Tr. 342:22-343:19.)  Mr. Nelson testified that Peak

had invested a lot of money in trying to promote Port-a-Pour, and it was trying to take advantage of that.  (*Id.* 343:14-20.)  Mr. Doherty testified that when the word "Port-a-Pour" is googled even as of the time of the hearing, Port-a-Pour's websites come up as well as Peak's website.  This causes Port-a-Pour to possibly lose leads regarding people interested in Port-a-Pour products.  (*Id.* 215:2-17.)

22.  Port-a-Pour contends that Peak also continued to use its proprietary technology after the Licensing Agreement terminated.  Exhibit 8 includes advertisements for Peak's products that Mr. Oberg testified support this allegation. (Tr. 65:2-22.)  Photographs 1 and 2 in Exhibit 8 are, according to Mr. Oberg, pictures and patent diagrams of Port-a-Pour's admixture or chemical metering system on Peak's website in the fall of 2013 under design build.  (*Id.* 65:23-66:24.)  Mr. Oberg testified that the photograph of the chemical metering system that Peak was offering on the website is identical to the patented chemical metering system developed and owned by Port-a-Pour (*id.* 66:25-68:4), and Port-a-Pour seeks to enjoin Peak from building or selling this system.  The photographs of the chemical metering system were not, however, on the website when Mr. Oberg looked before his testimony on January 8, 2014.  (*Id.* 68:5-12.)

23.  Mr. Oberg also testified that Peak's plant advertised in Exhibit 8 called the Peak Fusion (depicted in photograph 6 and which is a current offering of Peak) uses the Port-a-Pour proprietary design, including the chemical metering system, the blender, and the way the aggregate bins are mounted.  (Tr. 75:6-76:20.)  Further, he testified that the Peak-Matrix 500 and Peak-Matrix FF, depicted in photographs 7 and 9 of

Exhibit 8, are Port-a-Pour's Series II batch plants.  (*Id.* 78:7-79:4; 81:1-82:3.)[2] According to Mr. Oberg, the Peak-Matrix 500 and Peak-Matrix FF are similar in design and nature to an actual Port-a-Pour Series II batch plant advertised by Peak and depicted on page 11 of 24 of Exhibit 8.  (*Id.* 83:3-17.)  Mr. Oberg also stated that other products advertised in Exhibit 8, including the Peak-Magnum plant (photographs 12 and 13), use Port-a-Pour innovations/components and are Series II batch plants.  (*Id.* 85:20-86:22; 87:10-88:3; 89:23-90:9.)  He stated that Peak is essentially selling the Port-a-Pour Series II batch plant under a new name.  (*Id.* 86:23-25.)

24.  Mr. Oberg admitted, however, in connection with the photographs in Exhibit 8 that he had not actually inspected any of Peak's products.  He could not tell from some of the photographs whether the plants use the same type of components as the Series II, including the weight assembly load cell configuration, the blending feature, or other components.  (Tr. 124:2-126:1;130:18-132:19; 133:25-134:4; 136:8-14; 137:16-138:18; 154:6-14.)  He also admitted that some of Peak's products have components that are not used in the Series II.  (*Id.* 133:7-18; 137:9-139:3.)  Mr. Nelson testified that there was only a limited amount of information that could be determined from the photographs; for example, a person could not tell what type of blending system is within the equipment or the shape/dimension of the bins.  (*Id.* 274:3-6; 279:2-7.)

25.  There was also testimony from Mr. Oberg that horizontal low-profile auxiliary or aggregate bins that Peak advertises as its own products and depicted in photographs

---

[2]  Mr. Oberg testified that the photograph of the Peak-Matrix 500 is identical to or a modified version of the photograph on page 8 of Exhibit 8, which is a Series II plant in the Prairie Waters project in Aurora, Colorado.  (*Id.* 78:21-79:5; 80:11-14.)

14-16 and 18-20 of Exhibit 8—including the Lo-Pro 1600 Silo, the Lo-Pro 1100 Silo and the Lo-Pro 6-11—are Port-a-Pour products or were developed by Port-a-Pour.  (Tr. 90:10-14; 91:1-5; 93:10-15; 94:8-97:19.)  Peak is advertising the product depicted in photograph 18, the Lo-Pro 1600 Silo, as its product when in fact it specifically says "Port-a-Pour" on the machine.  (*Id.* 93:10-94:6; *see also* Ex. 8, p. 18.)

26.  Also, Peak's 2010 catalog offers a batch plant called the Port-a-Pour Series II, with the name appearing right on it.  (Ex. 11, p. 3.)  This appears to fall squarely within the terms of the parties' Licensing Agreement.  In addition, the 2010 catalog lists three products, the Lo-Pro 1100 horizontal silo, the Lo-Pro 1600 and the Lo-Pro 6-12, which are accompanied by a photograph of a horizontal silo branded with the "Port-a-Pour" Trademark.  (Ex. 11; Tr. 206:25-207:10; 208:19-209:3.)  Mr. Nelson admitted in his deposition that these horizontal silos had the name Port-a-Pour on them in the 2010 catalog because they were manufactured under the Licensing Agreement, and Peak offered them as its own products.  (*Id.* 348:24- 350:17.)  He also testified, however,  that Peak developed everything on its website except the Series II and the Lo-Pro 1600.  (*Id.* 357:6-15.)  Further, he admitted the Lo-Pro 1600 is similar in shape to the drawings Port-a-Pour presented, and when questioned as to whether it arose out of the Licensing Agreement, stated that depended on where the boundaries of the Licensing Agreement were drawn, *i.e.*, whether it encompassed only the Series II as he thought or also the Auxiliary Silo.  (*Id.* 368:19-369:13.)

27.  Mr. Doherty testified that Exhibit 36 came from Peak's website as of January 9, 2014, which states that Peak's inventory is also on line at "Rock & Dirt", a trade publication.  (Tr. 200:13–201:5.)  Mr. Doherty testified that some of Peak's products in

Exhibit 36 infringe or misappropriate Port-a-Pour's products and designs, including the products depicted on pages 6-17 as they are Port-a-Pour's designs. (*Id.* 202:17-206:6; 208:21-211:15.) Indeed, he testified that the horizontal silo on page 12 of Exhibit 36 has the name Port-a-Pour on it, and was still on the Rock & Dirt website as of the time of his testimony. (*Id.* 208:3-18.) Further, he stated that Peak's Lo-Pro 6-11 silo on page 13 of Exhibit 36 is the same silo as the Lo-Pro 6-12 silo with Port-a-Pour's name on it depicted at page 12 of Exhibit 11—Peak's 2010 catalog.

28.   When asked whether Mr. Doherty could tell from looking at the photographs in Exhibit 36 what the specific components of any of those pieces of equipment are, he testified that he could as to some of them—those that are marked with Port-a-Pour's name on them as they used Port-a-Pour's designs. (Tr. 237:14-238:2.) Mr. Doherty admitted that the newer Peak plants are not at issue in the case, unless they used the horizontal silo which he testified would be an infringement. (*Id.* 242:5-14.)

29.   As to the Auxiliary Silo, Mr. Nelson testified that the initial Auxiliary Silo that Port-A-Pour designed was made from an eight foot diameter scrap piece of pipe and was abandoned by Peak because it looked like a "Rube Goldberg" contraption. (Tr. 276:19-277:11.) The next Auxiliary Silo in the record was referred to by Neil Oberg as the "auxcmt1200", and the information and drawings regarding this silo were provided after the Licensing Agreement was entered into. (*Id.* 26:21-27:7.) The "auxcmt1200" was a 1200 cubic foot silo. According to Mr. Nelson, Peak opted to build a larger 1600 cubic foot silo, the Lo-Pro 1600.

30.   Peak built its last Lo-Pro 1600 in 2008. It was built during the term of the Licensing Agreement, and Mr. Nelson admitted that it still has one of these silos for

sale.  (Tr. 269:8-14; 278:2-3.)  Mr. Nelson testified that the Lo-Pro 1600 no longer has the words "Port-a-Pour" on it, as they were removed when the Licensing Agreement terminated.  (*Id.* 305:6-306:22.)  According to Mr. Nelson, Peak ceased building the Lo-Pro 1600 in 2008 for lack of customer demand and because the silo is too large.  (*Id.* 345:16-17, *see also* 268:8-14; 368:21-25.)  Peak opted instead to design the smaller Lo-Pro 1100 silo and to incorporate it into Peak's modular system, described below.  (*Id.* 368:13-20; 372:8-9.)[3]

31.  As to the design process of its products, Mr. Nelson testified that Peak's building of the Series II plant during the term of the Licensing Agreement was a design-and-build process, and that the drawings and information provided by Port-a-Pour were unreliable.  Accordingly, he testified that Peak made adjustments in building the Series II based on its research, including getting information from the products' vendors and from competitors' products.  (Tr. 275:12-276:3.)  Similarly, as to the Auxiliary Silo, Mr. Nelson stated that while Port-a-Pour provided drawings regarding how to build it and verbal information, Peak also got information about the design from component manufacturers and "decided ultimately what to do or not to do" in regard to its design. (*Id.* 278:4-11.)  However, Mr. Nelson admitted in his deposition that during the time of the Licensing Agreement, its fabricated metal horizontal silos were built "more or less" the way Neil Oberg and Jerry Doherty of Port-a-Pour conceived it.  (*Id.* 332:2-25.)

32.  Mr. Nelson testified that 60% of the design of the Peak product lines came from Port-a-Pour, and 40% came from Peak or other sources.  (Tr. 312:24-314:21.)  Of

---

[3] Mr. Nelson also stated that Peak would not build the Lo-Pro 6-12 again.  (*Id.* 381:11-15.)

the 60% that came from Port-a-Pour, Mr. Nelson testified that the information was generally available in the industry.  According to Mr. Nelson, a mechanic could figure the information out, or the information could be determined from suppliers of the components, technical journals, or engineering knowledge on the Internet.  (*Id.* 346:17-348:12.)  Mr. Nelson also testified that there was nothing proprietary or confidential about horizontal silos in general or the aggregate conveyors from the Port-a-Pour drawings.  (*Id.* 276:17-278:1; 285:19-286:5.)

33.  Defendants also contend that during the term of the licensing agreement, Peak abandoned many aspects of Port-a-Pour's products in favor of modifications that Peak created.  Thus, as to the Series II, Mr. Nelson testified that Peak abandoned the rotary-lobed style blower that it had observed on previous plants built by Port-a-Pour, and redesigned the blower system to use two vortex regenerative blowers to reduce cost and increase reliability.  (Tr. 281:3-18.)  Because Port-a-Pour's horizontal dust filter contained what Mr. Nelson characterized as "a lot of complexity for nothing," he stated that Peak rejected Port-a-Pour's filter design incorporating pneumatically actuated pulser valves in favor of direct electrically controlled valves, which Peak viewed as a more reliable system.  (*Id.* 282: 23-283:8.)  The electronic weighing system, which uses a load cell component sourced from a third party manufacturer, and the control panel were of Peak's own design, according to Mr. Nelson.  (*Id.* 260:8-15; 292:18-21; 287:14-17.)  Also, Peak used its own software instead of Port-a-Pour's software (*id.* 110:25-111:4), and Peak's products use a different mixing/blending system than that designed by Port-a-Pour.  (*Id.* 272:20 - 276:9.)  According to Mr. Nelson, the Series II had a twin screw that blended materials on a rudimentary level.  (*Id.* 271:14-20.)  Peak no longer

sells the Series II twin screw "blender" and never recommends it.  (*Id.* 272:11-15.)
Instead, Peak developed, recommends, and sells a paddle style blender that much
more thoroughly mixes the input materials.  (*Id.* 273:4-274:2; Ex. D-30.)

34.   According to Mr. Nelson, the horizontal silo that Peak developed is also
different than Port-a-Pour's Auxiliary Silo as the bin uses a different angle, has a
different load cell assembly, uses Peak's dust fans and the control panel was designed
by Peak from scratch.  The bin was redesigned so that the products could be
transported on the highway without permits.  (Tr. 280:2-14.)  Mr. Nelson also testified
that the trailer frame was designed by Peak and the landing jacks that transfer the
weight to solid ground are Peak's selections.  (*Id.* 279:18-280:7; 292:1-20.)

35.   In essence, then, Defendants contend that the Peak Max, the Peak
Magnum, and anything other than the Series II and the Lo-Pro 1600 were products it
developed independently.  (Tr. 357:11-358:25.)  They also assert that Peak made a
decision based on market demand and customer needs to abandon the Series II plant
and create a modular system.  (*Id.* 263:7-18.)  According to Mr. Nelson, Peak does not
make the Series II anymore because "nobody wants to buy them. . . they are expensive
. . . they require oversized, over-width, overweight permits to move them around, which
makes them awkward and expensive to move, they really can't be considered a
complete plant anymore because - because of the current need for a second powder
and mix design."  (*Id.* 261:14-21.)  Indeed, Mr. Nelson testified that Peak no longer
considers itself a manufacturer of batch plants, but of custom and semi-custom bulk-
material handling equipment.  (*Id.* 256:17-19.)  Peak puts together whatever parts the
customer wants, the way the customer wants it put together.  (*Id.* 256:25-257:1; 263:7-

18.)  Mr. Nelson contends that this "mix and match" system includes the Lo-Pro 1100, which is different in many important respects from the horizontal silo developed by Port-a-Pour, and is of Peak's own design as discussed in the previous paragraph.

36.  Mr. Nelson testified that a comparison of the drawings provided to Peak by Port-a-Pour and the information from the horizontal silos currently built by Peak shows that they are not the same, referring to photographs in Exhibit D-31.  (Tr. 278:21-279:1; 279:8-13.)  He also testified that a person cannot tell the differences from looking at the outside of the products in a photograph.  (*Id.* 279:2-7.)

37.  Defendants were asked the following questions in discovery and responded in pertinent part as follows:

> 2.  *Identify every Product you have offered for sale since June 12, 2013.*
> …every product offered for sale by Peak Innovations is listed on Peak's website. . . .

> 3.  *Identify every Product you currently offer for sale that consists of, uses or incorporates any Disputed Technology [including Port-a-Pour's patented chemical metering system].*
> . . . a.  Admix System. Products currently offered for sale which incorporate a chemical admixture system, include the Peak Max and Peak Magnum batch plants, which feature a chemical admixture system as an option. . . .

> 5.  *Identify every Communication you have had with any third party since June 12, 2013 related to any Product you offer for sale. . . .*
> . . . C.  On July 2, 2013 Peak made a proposal regarding a Peak Magnum plant to a potential customer. The chemical admixture is referenced as an option 1.11.2. . . .

> 10.  *Identify any actions you have taken since June 12, 2013, to ensure that you do not infringe the Patents or*

> *the Trademark, violate the terms of the License
> Agreement, misappropriate Plaintiff's Trade Secrets,
> or otherwise infringe the rights of Plaintiff.*
> Peak has been planning to redesign the admixture
> delivery system for a long time due to the inferior
> quality of some components and a desire to redesign
> the admixture delivery system around new
> components. Since Peak has not sold an admixture
> system recently, nor built one for approximately two
> (2) years, Peak has not invested significant resources
> in redesigning the admixture system. . . .

(Ex. 21.)

    38.  Also, Peak was asked in discovery (Interrogatory 6) to "Identify every

Document that describes, relates to, or refers to any Product you have offered for sale

since June 12, 2013, including, without limitation, catalogs, price lists, web pages,

Facebook posts, product lists, brochures, emails. . ., advertisements or prospective

advisements."  (Ex. 21; *see also* Tr. 213:13-21.)  Defendants responded in pertinent

part as follows:  "Disclosed contemporaneously herewith are technical drawings and

information related to the admixture system, horizontal dust filter and air slide assembly.

All of the drawings were created by Peak.  The knowledge required to create the

drawings was obtained from Parts vendors, backwards engineering for [Port-a-Pour]

products, Portable Batch Systems products, our own common sense and technical

experience, from our employees (particularly Paul Romero who has extensive

experience building and repairing batch plant components), from verbal information

from [Port-a-Pour] employees (which was often conflicting) and from what we could

glean from the jumbled and incomplete drawings from [Port-a-Pour]."  (Ex. 21; Tr.

213:22-214:14.)  Mr. Doherty testified that this response is not accurate, as Defendants

did not backwards engineer the products.  They got the information from Port-a-Pour.

(Tr. 214:22-215:1.)  Indeed, Mr. Nelson testified that he has not backwards engineered silos from competitor's products.  (*Id.* 333:1-10.)

39.  Mr. Oberg testified that if Peak started all over from scratch to develop its own plant and did not use any drawings or information from Port-a-Pour, it would have no problem with that.  It was the use of Port-a-Pour's designs for their components and systems that is the problem.  (Tr. 173:18-174:19.)  Mr. Oberg also testified that Port-a-Pour spent $880,000 over 20 years developing its protected information.  (*Id.* 181:9-15.)  Consistent with this, Mr. Doherty testified that the designing of a brand-new batch plant from the ground up could take in the million dollar range.  (*Id.* 217:23-218:2.)  Notably, Peak independently developed one element to run the Port-a-Pour Series II; namely, the plant software.  On this element alone, Peak spent $384,000.  (*Id.* 344:6-15.)[4]

40.  The specific products or actions that the Court is asked to enjoin by Port-a-Pour are:

    a.    Horizontal silos that are derivatives of the Auxiliary Silo developed by Port-a-Pour, including, without limitation, Peak's Lo-Pro 1100, the Lo-Pro 1600, the Lo-Pro 6-11, and the Peak-Matrix PB (referred to herein as "Peak Horizontal Silos").  Port-a-Pour contends that the Auxiliary Silos lie at the heart of the parties' dispute, because Peak still builds and offers for sale horizontal silos including the Lo-Pro 1100, the Lo-Pro 1600 and the Lo-Pro 6-11, as well as other versions of the Auxiliary Silo, in violation of Port-a-Pour's intellectual property rights.  Further, it contends that Peak continues to offer these products online.  (Exs. 8, 36.)

    b.    Port-a-Pour's patented chemical metering system; and

---

[4] Port-a-Pour also notes that Peak developed a batch plant on its own without using Port-a-Pour's designs.  That design, called the "Peak Max", featured a silo built out of a shipping container and was abandoned for lack of demand.  (*Id.* 344:16-345:19.)  Port-a-Pour was aware as early as July of 2009 that Peak was developing this plant and that it was not within the Licensing Agreement.  (*Id.* 239:14-240:9; 241:10-20; Exs. D1 (¶ 8), D4.)  Port-a-Pour requested that Peak pay it a royalty of $20,000 for the chemical metering system used in the plant.  (*Id.* 240:18-24.)

c.    Peak's use of the "Port-a-Pour" Trademark and the continued registration of the Port-a-Pour URLs.  Port-a-Pour contends that Peak has used the trademark "Port-a-Pour" in advertisements continuously since the termination of the Licensing Agreement (Ex. 36).

41.  Port-a-Pour also seeks an order for Peak to release its registration of the Port-a-Pour URLs.

42.  Peak does not oppose an injunction against Peak's use of Port-a-Pour's Trademark so long as it is narrowly tailored to enjoin Peak from selling any product that uses the words "Port-a-Pour."  (Tr. 402:8-24.)

III.    CONCLUSIONS OF LAW

A.    Threshold Issues

1.  This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §111 *et seq.*, for trademark infringement arising under the Lanham Trademark Act, 15 U.S.C. §§ 1051 *et seq.*, and other related claims.

2.  This court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1221 and 28 U.S.C. §§ 1331 and 1338(a).

3.  This court has supplemental jurisdiction over the non-federal claims pursuant to 28 U.S.C. § 1367.  The court applies Colorado law to the state claims.  *See, e.g., Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1257-60 (D. Colo. 2005).

B.    Preliminary Injunction Standard

4.  "A preliminary injunction is an extraordinary remedy, the exception rather than the rule."  *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888 (10th Cir. 1989).  "A preliminary injunction may issue if the movant clearly shows: (1) a substantial likelihood of success

on the merits; (2) irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm the preliminary injunction will cause the opposing party; and (4) the preliminary injunction is not adverse to the public interest." *Big O Tires, Inc. v. Bigfoot 4X4, Inc.,* 167 F. Supp. 2d 1216, 1221 (D. Colo. 2001) (citing *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir. 1991)).

5. According to the Tenth Circuit, "'because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.'" *Beltronics USA, Inc. v. Midwest Inventory,* 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers,* 321 F.3d 1250, 1256 (10th Cir.2003)). In other words, "[b]ecause it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established." *Citizen Band Potawatomi Indian Tribe of Okla.,* 883 F.2d at 888-89.

6. "[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Schrier v. Univ. of Colo.,* 427 F.3d 1253, 1258 (10th Cir. 2005) (quotation omitted). As such, there are "'three types of specifically disfavored preliminary injunctions ...: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.'" *Id.* (quoting *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,* 389 F.3d 973, 975 (10th Cir. 2004)). A movant seeking a preliminary injunction that falls within one of these three categories must meet a heightened burden. *O Centro,* 389 F.3d at 975. I find that the injunction sought by Port-a-Pour is prohibitory in nature, and is not one of the disfavored types of injunctions.

7.   In this case, three categories of illegal competition are alleged; namely, breach of contract/misappropriation of trade secrets (as to the Peak horizontal silos), patent infringement (as to the chemical metering system), and infringement of the trademark/misappropriation of the Port-a-Pour URLs.  I note that Injunctive relief is explicitly authorized by the enabling statutes for each of the statutory claims Port-a-Pour asserts.  *See* Colo. Rev. Stat. § 7-74-103 (providing for injunctive relief on such terms as may be just to remedy misappropriations of trade secrets); 35 U.S.C. § 283 (providing for injunction of patent infringement); 15 U.S.C. § 1114(b) (providing for injunction of trademark infringement); 15 U.S.C. §1125(a) (providing for injunction of cybersquatting).  I now turn to Port-a-Pour's likelihood of success on the merits as to each category.

C.      Likelihood of Success on the Merits

8.   Port-a-Pour contends that its drawings, specifications and designs for the Auxiliary Silo are protected as proprietary information under the Licensing Agreement and the Confidentiality Agreements.  In addition, Port-a-Pour contends that its drawings, specifications and designs for the Auxiliary Silo are protected as trade secrets under the Colorado Uniform Trade Secrets Act, Colo. Rev. Stat. § 7-74-101, *et seq.* ["CUTSA"].  Port-a-Pour further contends that the Peak horizontal silos infringe these protected rights.  I discuss these issues in turn.

Breach Of Contract Claim

9.   The parties agree that the Port-a-Pour Series II batch plant falls within the Licensing Agreement and the Confidentiality and Nondisclosure Agreements.  (Tr. 354:23-355:13.)  Port-a-Pour contends that the Auxiliary Silo also falls within the terms

-24-

of these Agreements as "plant support equipment".  Defendants dispute this.  Thus, I must review the Agreements to determine whether the Auxiliary Silo is a covered product.

10.  Interpretation of a contract is a question of law.  *Arapahoe Cnty. Water & Wastewater Pub. Improvement Dist. v. HDR Eng'g, Inc.*, No. 08-cv-01788-WYD, 2011 WL 5025022, at *2 (D. Colo. Oct. 21, 2011) (citing *Premier Farm Credit, PCA v. W–Cattle, LLC,* 155 P.3d 504, 517 (Colo. App. 2006)).  "In construing [a contract], the primary obligation 'is to effectuate the intent of the contracting parties according to the plain language and meaning of the contract.'"  *Id.* (quoting *Albright v. McDermond,* 14 P.3d 318, 322 (Colo. 2000)).  "'The overriding rules of contract interpretation require a court to apply the plain meaning of the words used, subject to interpretation from the context and circumstances of the transaction.'"  *Id.* (quoting *id.*)

11.  The Licensing Agreement includes Port-a-Pour's trade secrets and other proprietary information relating to a portable batch plant for making concrete and "plant support equipment" as part of the definition of the "Products" or "Agreement Products" that Port-a-Pour owns.  (Ex. 3, First Recital; *see also id.* ¶¶ 1.01—defining "Agreement Products" as "any product in which Port-a-Pour has a protected proprietary interest; 1.02—defining "Port-a-Pour's "trade secrets" as "all that information, drawings, data, architectural specifications and the like"; 2.02—granting license to Peak to make, use, sell and assemble Agreement Products; 4.01(b)—terminating Peak's license rights upon termination of Licensing Agreement; 4.03—requiring Peak to return to Port-a-Pour "any and all drawings, specifications, models, brochures, documents and/or other property previously received from [Port-a-Pour]".  Also, in the first and second recitals on page

-25-

one of the Licensing Agreement, "Agreement Product" or "Products" are defined as "a portable batch plant for making concrete, and plant support equipment."  (Ex. 3).

12.   The First and Second Confidentiality and Nondisclosure Agreements define Port-a-Pour's "Protected Information" to include "all information which is proprietary to, and trade secrets of Port-a-Pour relating to a portable concrete batch plant and plant support equipment; specifically including any and all patents issued or pending to Port-a-Pour and all other trade secrets disclosed by Port-a-Pour to Recipient relating to the portable concrete batch plant and plant support equipment.  (Ex. 4.)

13.   Giving the language of the Agreements their plain meaning, I find that the drawings provided by Port-a-Pour to Peak related to the Series II and the Auxiliary Silo are protected under the Agreements  as proprietary.  I find that the Auxiliary Silo is encompassed within the Agreements based on the language therein that the Products at issue include "plant support equipment."  This interpretation—that the Auxiliary Silo is intended to be protected by the Agreements—is supported by several facts.

a.   First, the Auxiliary Silo works exactly the same as the powder silo incorporated into the Series II batch plants.  (Tr. 27:21-24; 59:23-60:5.)  The technology is the same.  (*Id.*)  Thus, Port-a-Pour contends that they both have the identical low-profile design with the low-profile horizontal dust filter; both discharge their powder by the use of air slides that fluidize the powder; both determine the amount of powder dispensed by decumulative weighing using integrate load cells; and both are integrated into the system controller, which governs the discharge of the powder identically into the concrete mix.  (*Id.* 30:2-31:2.)  Indeed, the only difference between the cement silo incorporated into the batch plants and the standalone Auxiliary Silo are the physical dimensions.  (*Id.* 60:2-3.)  Port-a-Pour contends that the built-in silo has to be smaller to fit on the same trailer with the rest of the components of a plant, whereas the Auxiliary Silo is larger since it sits on its own trailer.

b.   Second, the intended purpose of the Auxiliary Silo is to be incorporated into a batch plant when two powders (cement and fly ash) are required in the concrete mix design.  (Tr. 27:12-20; 28:4-10.)   It is integrated control-wise into the plant, according to Mr. Oberg, and both products are needed to comply with that requirement.  (*Id.* 28:10-21.)  Once the Auxiliary Silo is connected to a batch plant, it essentially becomes part of the plant.

14.   For these reasons, I find that the Auxiliary Silo is a product subject to the Licensing Agreement as plant support equipment.  Indeed, it would lead to an absurd result to adopt Peak's assertion that the Auxiliary Silo is *not* protected by the Agreements, since the Auxiliary Silo is essentially the same design as the Series II batch plant silo which Peak admits is protected.

15.   I also find the Auxiliary Silo and information and drawings related to same are covered under the Agreements' broad language protecting "*all information which is proprietary to, and trade secrets of Port-a-Pour relating to a portable concrete batch plant and plant support equipment . . . .*" (*See* Ex. 4, First Confidentiality and Nondisclosure Agreement at p. 1; *see also* Ex. 3, Licensing Agreement at Sections 1.01—defining "Agreement Products" as "any product in which Port-a-Pour has a protected proprietary interest, including without limitation, any product disclosed in trade secrets or other information disclosed to Peak, specifically including trade secrets and proprietary information contained in the Confidentiality and Non-Disclosure Agreement  . . . ." and 1.02—defining "trade secrets" as "all that information, drawings, data, architectural specifications and the like (herein collectively called "information") known from time to time by Licensor relevant to the manufacture, use, sale, and assembly of a mobile concrete batch plant, including all information, drawings, data, software, source code, design specifications, wiring diagrams, blending systems, and other specifications

related to Agreement Products, which is contemplated to be transferred to Licensee by Licensor in order to enable Licensee to manufacture, use, sell, and assemble the mobile concrete batch plant."

16.   In so finding, I reject Defendants' arguments that the drawings provided by Port-a-Pour to Peak regarding its Series II and Auxiliary Silo are not proprietary because (1) the functional aspects of concrete batch plants and horizontal silos are widely known in the marketplace; (2) there is nothing proprietary about the components of the products; or (3) the technology can be and has been reverse engineered by Mr. Nelson.

17.   As to the first two arguments I note, among other things, that Peak relies on a scholarly paper and offerings from competitors to argue that the components of the Series II and the Auxiliary Silo, such as airslides, belt feeders, load cells, dust filters, chemical metering systems, and the like are widely used in the industry.  Defendants also rely on material developed during discovery after the preliminary injunction hearing in support of its argument that the technology at issue was publically known and available before Port-a-Pour provided any information to Peak.  (*See* "Notice of Supplemental Authority in Supp. of Defs.' Opp. to Pl.'s Mot. Prelim. Inj. (ECF# 44) and Defs.' [Proposed] Findings of Fact and Conclusions of Law (ECF# 73)", ECF No. 113.)  However, I find credible the testimony from Port-a-Pour's representatives that the Series II batch plant and the Auxiliary Silo are unique in that Port-a-Pour made modifications to and innovations to the components based on several iterations that resulted in proprietary information.  (Tr. 170:10-173:13.)  This is the technology that it licensed to Peak.  (*Id.* 173:14-17.)  The fact that the components are widely used in the industry or

are in the public domain is not dispositive, as "[i]t is widely accepted that a trade secret can exist in a combination of characteristics each of which, by itself, is in the public domain." *Catalyst & Chemical Servs. Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 9 (D.D.C. 2004), *aff'd*, 173 Fed. Appx. 825 (Fed. Cir. 2006).

18.   The Sixth Circuit's opinion in *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398 (6th Cir. 2006) supports my finding in the previous paragraph.  That court noted that "a new combination of known steps or processes can be entitled to trade secret protection."  *Id.* at 411.  There, design drawings were properly considered trade secrets even though they contained "a mixture of secret information (e.g., dimensions, tolerances, and data-reference points) and non-secret information."  *Id.*  The Sixth Circuit held that "[w]hen material such as design drawings or manuals are trade secrets based on a unique combination of both protected and unprotected material, a plaintiff should not be obligated to identify which components of the protected material is secret."  *Id.* (citing *3M v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001) (holding that "[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret")).  Similarly, Colorado law holds that "[n]ovelty and invention are not required for a trade secret.  The protection is merely against breach of faith and reprehensible means of learning another's secret."  *Ovation Plumbing Inc. v. Furton*, 33 P.3d 1221, 1224 (Colo. App. 2001).

19.   Peak's third argument, that it is entitled to use Port-a-Pour's designs because Mr. Nelson reverse-engineered Port-a-Pour's designs, is also unavailing.

While reverse engineering may sometimes be an appropriate way to discover a competitor's trade secrets, Colorado law prohibits reverse engineering by a party who has a duty of nondisclosure or nonuse—as Peak assumed by entering into the Licensing Agreement and the Confidentiality Agreement. *Mineral Deposits Ltd. v. Zigan*, 773 P.2d 606, 608 (Colo. App. 1988) (reverse engineering permissible, except where trade secret is divulged "under an express or implied restriction of nondisclosure or nonuse") (citing *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470 (1974)).  Moreover, Mr. Nelson testified that he has not backwards engineered silos from competitors' products.  (*Id.* 333:1-10.)

20.   In further support of my finding, I note that the Licensing Agreement contains the following provision:  "If some of the information transmitted by Licensor to Licensee is information previously or otherwise known to Licensee, this fact alone shall not derogate the trade secret and proprietary nature of the entire body of information to be transmitted under this Agreement from Licensor to Licensee."  (Ex. 3, ¶1.02.)  This provision forecloses Peak's arguments that Port-a-Pour's Protected Information is not proprietary or "trade secrets," since it explicitly agreed to the contrary.  This also forecloses Defendants' argument that the information provided by Port-a-Pour was not proprietary because it was provided prior to execution of the Agreements.

21.   I also conclude that the information in the patents related to the chemical metering system are protected as proprietary.

22.   Finally, I find that Peak breached the Licensing Agreement by continuing to sell products that were derived from the proprietary information provided to it by Port-a-Pour.  I first note that during the active period of the Licensing Agreement, Peak

manufactured and offered for sale three products that it advertised in its 2010 catalog: the Lo-Pro 1100, the Lo-Pro 1600, and the Lo-Pro 6-12.  (*See* Ex. 11.)  Each of these products was branded with the "Port-a- Pour" Trademark.  The evidence showed that these products or some derivative of them, *i.e.,* the Lo-Pro 6-11, were still being offered as of the time of the hearing on the preliminary injunction motion.  (Ex. 36.)[5]  While the other two horizontal silos Peak offered no longer contained the name Port-a-Pour on them, Peak was still offering the Lo-Pro 1600 horizontal silo with the name Port-a-Pour on it (Ex. 36, p. 12), and it was still on the Rock & Dirt website as of the time of Mr. Doherty's testimony.  (Tr. 208:3-18.)  However, at the hearing on the preliminary injunction motion, I authorized the removal of this photograph by Peak. (Tr. 409:19-410:15.)  The affidavit of Mark Nelson filed with the Court on March 6, 2014, confirms its removal from Peak's website and from all advertisements.  (ECF No. 73-2.)

23.  Defendants assert that an injunction is not appropriate because Peak is no longer selling products with the Port-a-Pour name on it.  I agree that "[t]he purpose of a preliminary injunction hearing is not to remedy past harm but to protect plaintiffs from irreparably injury that will surely result without their issuance."  *Schrier*, 427 F.3d at 1267.  However, I find that Port-a-Pour met its burden for purposes of the preliminary injunction motion of showing that at least two horizontal silos still sold by Peak violate the Licensing Agreement by using Port-a-Pour's proprietary information.  Thus, there is evidence that both the Lo-Pro 6-11 and the Lo-Pro 1600 are still being sold, although

---

[5] Exhibit 36 advertises a Lo-Pro 6-11 instead of a Lo-Pro 6-12.  Mr. Doherty testified that Peak's Lo-Pro 6-11 silo on page 13 of Exhibit 36 is the same silo as the Lo-Pro 6-12 silo with Port-a-Pour's name on it depicted at page 12 of Exhibit 11, Peak's 2010 catalog.  The only difference appears to be that the Lo-Pro 6-11 offers an 1100 cubic foot silo for fly ash and cement as compared to the 6-12 that offers a 1200 cubic foot silo.  (*See id.*)

Peak has removed the Port-a-Pour name from them.  I find for purposes of Plaintiff's motion that these products are derived, at least in part, from the Port-a-Pour proprietary information/drawings provided to Peak, and that the continued sale of these products violates the Licensing Agreement.

24.   Peak admitted, through Mr. Nelson, that the Lo-Pro 6-12 (which I find to be essentially the same as the Lo-Pro 6-11) and the Lo-Pro 1600 silo were developed during the term of the Licensing Agreement.  Indeed, Mr. Nelson admitted in his deposition offered at the preliminary injunction hearing that the horizontal silos offered in the 2010 catalog (which include the Lo-Pro 6-12 and the Lo-Pro 1600) had the name Port-a-Pour on them in the 2010 catalog because they were manufactured under the Licensing Agreement and Peak offered them as its own products.  (Tr. 348:24- 350:17.) Mr. Nelson also admitted that Peak did not return Port-a-Pour's drawings when the license terminated, and did not stop using the manufacturing drawings for the products it had developed during the licensing period.  (*Id.* 339:7-340:3.)

25.   Further, Mr. Nelson admits that 60% of the design of the Peak product lines that were designed during the Licensing Agreement—which would include the Lo-Pro 1600 and the Lo-Pro 6-11 or 6-12—came from Port-a-Pour, and 40% was re-designed or re-engineered by Peak.  (Tr. 314:9-21.)  He also admitted in his deposition offered at the hearing that during the time of the Licensing Agreement, Peak's fabricated metal horizontal silos were built "more or less" the way Neil Oberg and Jerry Doherty of Port-a-Pour conceived them.  (*Id.* 332:2-25.)  These admissions are dispositive of Peak's contradictory assertion that Peak did not receive, or alternatively, did not use any of Port-a-Pour's design in any of its horizontal silos.

-32-

26. Further as to the Lo-Pro 1600, Mr. Nelson testified that Peak developed everything on its website except the Series II and the Lo-Pro 1600. (Tr. 357:6-15.) Thus, he essentially admitted that Peak did not develop this product. Further, he admitted the Lo-Pro 1600 is similar in shape to the drawings Port-a-Pour presented, and when questioned as to whether it arose out of the Licensing Agreement, stated that depended on where the boundaries of the Licensing Agreement were drawn, *i.e.*, whether it encompassed only the Series II as he thought or also the Auxiliary Silo. (*Id.* 368:19-369:13.) Since I found previously that the License Agreement does encompass the Auxiliary Silo, Mr. Nelson's testimony supports the finding that the Lo-Pro 1600 arose out of and was developed under that Agreement.

27. I also note Mr. Nelson admitted that Port-a-Pour's Auxiliary Silo and Peak's horizontal silos are functionally identical. (Tr. 330:23-332:25; 333:14-334:9.) Both products have the same features and functionalities: a low-profile design with a low-profile horizontal dust filter, making the silo capable of being transported in one piece by truck; both discharge their powder by the use of air slides that fluidize the powder; and both measure the amount of powder dispensed by decumulative weighing using integrate load cells. While Mr. Nelson pointed to differences in regard to its horizontal silos as compared to Port-a-Pour's, I find the differences immaterial as they relate to the Lo-Pro 6-11 or the Lo-Pro 1600 because I find they were built using Port-a-Pour's proprietary information. Further, while Defendants point to the fact that Port-a-Pour did not examine Peak's products and can only glean limited information from the photographs, I find this immaterial based on the evidence adduced at the hearing, including the testimony of Mr. Nelson discussed above.

28.   Based on the foregoing, I find that Port-a-Pour has shown for purposes of the preliminary injunction motion that  Peak's Lo-Pro 6-11 and 6-12 and the Lo-Pro 1600 horizontal silos are derived in material part on Port-a-Pour's protected information in violation of the Licensing Agreement and the Confidentiality Agreements.  The Licensing Agreement prohibits *any* further use by Peak of Port-a-Pour's proprietary and protected information after the termination of the Licensing Agreement.  (Ex. 3.) The Confidentiality Agreements prevent the use or disclosure of Port-a-Pour's protected information and also prohibit Peak and Mr. Nelson, personally, from using such information "to create any competing business entity, products or consulting services".  (Ex. 4 at p. 1.)  Accordingly, I find that Port-a-Pour has demonstrated a likelihood of success in connection with its breach of contract claim.

29.   However, I find the evidence too muddled to find a likelihood of success on the merits as to a breach of the parties' Agreements as to the other horizontal silos manufactured by Peak that Port-a-Pour seeks to enjoin; namely, the Lo-Pro 1100 and the Peak-Matrix PB.  First, I find limited evidence in the record regarding the Peak-Matrix PB, and no evidence that supports a finding that Peak used Port-a-Pour's proprietary information in connection with this product.  To the extent Port-a-Pour may be relying on a photograph of the Peak-Matrix PB in Exhibit 36 (at page 10), I find from the evidence discussed in Section II, *supra*, that the photographs do not provide enough information about the product's components for the Court to find that they use Port-a-Pour's proprietary data.

30.   As to the Lo-Pro 1100, I note that Mr. Nelson testified that Peak ceased building the Lo-Pro 1600 in 2008 for lack of customer demand and because the silo is

too large.  (Tr. 345:16-17; 268:8-14; 368:21-25.)  Peak opted instead to design the smaller Lo-Pro 1100 silo and to incorporate it into Peak's modular system.  (*Id.* 368:13-20; 372:8-9.)  While the Lo-Pro 1100 has the same functionality as Peak's other horizontal silos and certainly looks similar in design, I find persuasive Mr. Nelson's testimony that this product differs in many important respects from the Auxiliary Silo developed by Port-a-Pour, and is of Peak's own design.  Thus, Mr. Nelson testified that the Lo-Pro 1100's bin uses a different angle, it has a different load cell assembly, uses Peak's dust fans and the control panel was designed by Peak from scratch.  The bin was also was redesigned so that the products could be transported on the highway without permits.  (*Id.* 280:2-14.)  Mr. Nelson also testified that the trailer frame was designed by Peak and the landing jacks are Peak's selections.  (*Id.* 279:18-280:7; 292:1-20.)  Based on this evidence, I find that Port-a-Pour did not demonstrate a likelihood of success on the merits with regard to the breach of contract claim as to the Lo-Pro 1100 horizontal silo offered by Peak.

31.  I do, however, find that Port-a-Pour has also demonstrated a likelihood of success on the merits as to a breach of the Licensing Agreement and the Confidentiality and Nondisclosure Agreements in regard to the chemical metering system that is the subject of the patents and which I previously found to be proprietary.  As such, I find that the chemical metering system is protected under the Agreements.  Mr. Oberg testified credibly that Peak offered a chemical admixture system on its web site in the Fall of 2013.  (Tr. 65:23-66:5.)  In addition, Mr. Oberg testified credibly that the chemical admixture or metering system depicted on the Peak website in the Fall of 2013 is identical to Port-a-Pour's chemical metering system.  (*Id.* 66:6-68:4.)  Finally, Mr. Oberg

testified that the drawings and specifications necessary to build the chemical metering system were provided to Peak. (Tr. 67:15-25; Ex. 8 at pp. 3-4.) While Mr. Nelson testified that Peak does not offer the chemical metering system anymore and it is no longer in Peak's current offering of products as a stand-alone product (Ex. 36), I find from Peak's Responses to Interrogatories, signed under oath by Mark Nelson, that Peak may still be offering the chemical metering system for sale.

32.    Thus, in response to an Interrogatory asking Peak to identify every product it currently offers for sale that consists of, uses or incorporates any Disputed Technology [including the patented chemical metering system], Peak responded the "Admix System. Products currently offered for sale which incorporate a chemical admixture system, include the Peak Max and Peak Magnum batch plants, which feature a chemical admixture system as an option." (Ex. 21.) In response to an Interrogatory asking Peak to "identify every Communication it has had with any third party since June 12, 2013 related to any Product you offer for sale. . . .", Peak responded that on "July 2, 2013, Peak made a proposal regarding a Peak Magnum plant to a potential customer. The chemical admixture is referenced as an option 1.11.2." (*Id.*) Finally, in response to an Interrogatory asking Peak to identify any actions it has "taken since June 12, 2013, to ensure that you do not infringe the Patents or the Trademark, violate the terms of the License Agreement, misappropriate Plaintiff's Trade Secrets, or otherwise infringe the rights of Plaintiff", Peak stated in response:

> Peak has been planning to redesign the admixture delivery system for a long time due to the inferior quality of some components and a desire to redesign the admixture delivery system around new components. Since Peak has not sold an admixture system recently, nor built one for

approximately two (2) years, Peak has not invested significant resources in redesigning the admixture system.

(*Id.*)

33.   I find that Peak's responses detailed in the previous paragraph, taken together, plausibly demonstrate that (a) Peak continues to offer products with a chemical metering system, and (b) that while Peak has been "planning" to design a new chemical metering system, it has not yet done so.  Since Peak has not designed its own system, the only logical assumption is that it is still offering Port-a-Pour's chemical metering system.  This would also constitute a breach of the Agreements, and Plaintiff has demonstrated a likelihood of success on its contract claim as to this system.

34.   Finally, I note that while there was evidence that Peak may have violated the parties' Agreements in regard to its sale of Series II concrete batch plants, Port-a-Pour did not ask in its proposed Findings of Fact or Conclusions of Law for the Court to enjoin Peak's sale of these plants (*e.g.,* the Peak Fusion, the Peak-Matrix 500 or FF, or the Peak Magnum).  Indeed, Mr. Doherty testified that Peak's newer plants are not at issue in the case, unless they used the horizontal silo which he testified would be an infringement.  (Tr. 242:5-14.)  To the extent an injunction is sought as to these plants, I find that Port-a-Pour has not shown a likelihood of success on the merits.  Mr. Oberg admitted in connection with the photographs of these plants that he had not actually inspected any of Peak's products.  He could not tell from some of the photographs shown to him on cross examination whether or not the plants use the same type of components as used in the Series II, including the weight assembly load cell configuration, the blending feature, or other components.  (*Id.* 124:2-126:1;130:18-

132:19; 133:25-134:4; 136:8-14; 137:16-138:18; 154:6-14.)  He also admitted that some

of Peak's products have components that are not used in the Series II.  (*Id.* 133:7-18;

137:9-139:3.)  Mr. Nelson testified that there was only a limited amount of information

that could be determined from the photographs; for example, a person could not tell

what type of blending system is within the equipment or the shape/dimension of the

bins.  (*Id.* 274:3-6; 279:2-7.)

 35.  In conclusion, I find that Port-a-Pour has established a likelihood of

success on the merits on its claim that the Peak's Lo-Pro 6-11 and 6-12 and the Lo-Pro

1600 violate the Licensing Agreement and the Confidentiality and NonDisclosure

Agreements.  I also find Port-a-Pour has established a likelihood of success on the

merits in regard to the chemical metering system, *i.e.*, that Peak is offering for sale Port-

a-Pour's chemical metering system which is proprietary information protected by the

Agreements.  I find that Port-a-Pour did not establish a likelihood of success in regard to

Peak's other horizontal silos (the Lo-Pro 1100 or the Peak-Matrix PB) or its concrete

batch plants.

<u>Misappropriation Of Trade Secrets</u>

 36.  Port-a-Pour also asserts that Peak misappropriated its trade secrets,

consisting of the designs, drawings and specifications of Port-a-Pour's Auxiliary Silo,

which Peak uses illegally in manufacturing its competing silos.

 37.  The Colorado Uniform Trade Secrets Act, Colo. Rev. Stat. § 7-74-101, *et

seq.* ("CUTSA") governs the misappropriation of trade secrets in this case.  *See

Doubleclick,* 402 F. Supp. 2d at 1257.  "Colorado courts may consider several factors to

make the factual determination of whether a trade secret exists" under CUTSA.  *Saturn*

*Sys. Inc. v. Militare*,  252 P.3d 516, 521 (Colo. App. 2011).  This includes "(1) the extent

to which the information is known outside the business; (2) the extent to which it is

known to those inside the business, such as the employees; (3) the precautions taken

by the holder of the trade secret to guard the secrecy of the information; (4) the savings

effected and the value to the holder in having the information as against competitors; (5)

the amount of effort or money expended in obtaining and developing the information;

and (6) the amount of time and expense it would take for others to acquire and duplicate

the information.  *Id.* at 521-22.

      38.  I heard the following uncontested testimony from Port-a-Pour related to

its drawings and specifications (the "Protected Information") for its product line.  The

"Protected Information" as defined in the Confidentiality and Nondisclosure Agreements

is not known outside Port-a-Pour, and has been released to outsiders only twice

(including once to Peak) and on both occasions under confidentiality agreements.  (Tr.

189:2-20.) The Protected Information is known to only two people inside Port-a-Pour,

Mr. Doherty and Mr. Oberg, and is otherwise kept locked and secured.  (*Id.* 188:2-17.)

Other employees, such as the fabricators who build the machines, receive drawings on

a need-to-know basis, i.e., a single drawing to build the specific subassembly, and once

that subassembly is complete, the drawing is destroyed.  (*Id.* 188:16-189:1.)  The

Protected Information is inaccessible to anyone but Mr. Oberg and Mr. Doherty, except

on a need-to-know basis.  (*Id.*)  Port-a-Pour has never released the drawings to anyone

except under legal agreements to protect the confidentiality (*id.* 189:2-20) or in the case

of Peak, under an agreement in principal to keep the information confidential until a

confidentiality agreement was signed.  (*Id.* 193:7-13.)

39.   There is also evidence that Port-a-Pour's product line, including the Auxiliary Silo, is proprietary and unique in the industry which gives Port-a-Pour an advantage in the marketplace.  Indeed, Port-a-Pour spent $880,000 over 20 years developing its Protected Information.  (Tr. 181:9-15.)  Peak agreed to pay substantial licensing fees to acquire the right to manufacture Port-a-Pour's product line—and generated over $4 million in revenue in four years of operating under the Licensing Agreement.  Research and development is expensive and time-consuming, as Peak's own experience shows.  Peak independently developed one small element of the Port-a-Pour Series II; namely, the plant software.  On this element alone, Peak spent $384,000.  (*Id.* 344:6-15.)  In addition, Peak attempted to develop products on its own without using Port-a-Pour's designs.  One such design was the "Peak Max," which featured a silo built out of a shipping container—a product that Peak abandoned for lack of demand.  (*Id.* 344:16-345:19.)  Mr. Doherty estimated that it would cost at least $1 million to develop a new line batch plant from scratch.  (*Id.* 217:23-218:2.)

40.   From the foregoing, I find that Port-a-Pour has established that its Protected Information under the parties' Agreements, including the drawings and information given to Peak as to the Series II and the Auxiliary Silo, constitute its trade secrets under Colorado law under each of the six factors.

41.   I next consider whether Peak's use of the Protected Information in the Peak Horizontal Silos constitutes a misappropriation of Port-a-Pour's trade secrets. According to the Colorado Court of Appeals:

> Under the CUTSA, "misappropriation" is defined in pertinent part as the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."

§ 7–74–102(2)(a), C.R.S. 2010.' '"Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* at § 7–74–102(1). As a prior division of this court observed, "[t]here is no requirement in Colorado's [UTSA] that there be actual use or commercial implementation of the misappropriated trade secret for damages to accrue. Misappropriation consists only of the improper disclosure or acquisition of the trade secret." *Sonoco Prods. Co. v. Johnson,* 23 P.3d 1287, 1290 (Colo. App. 2001).

*Saturn Sys., Inc.,* 252 P.3d at 525 (emphasis added).

42. Here, as discussed above, Peak and Mr. Nelson both have specific contractual duties to maintain the secrecy of Port-a-Pour's trade secrets and to return the information related to the trade secrets after termination of the Licensing Agreement. Evidence was presented that Peak retained Port-a-Pour's drawings which are trade secrets after the termination of the Licensing Agreement. Moreover, Port-a-Pour presented evidence which I find demonstrates for purposes of the preliminary injunction motion that Peak incorporated a material part of Port-a-Pour's trade secrets from its drawings into its Lo-Pro 6-11/6-12 and Lo-Pro 1600, which products are still being offered for sale. I also find that this shows a likelihood of success under the CUTSA for misappropriation of a trade secret. *See Ovation Plumbing Inc. v. Furton*, 33 P.3d 1221, 1224 (Colo. App. 2001) ("Novelty and invention are not required for a trade secret. 'The protection is merely against breach of faith and reprehensible means of learning another's secret' . . . . The heart of Ovation's trade secret claim is that Furton misappropriated [its trade secret relating to a bid] and used it to his advantage and to Ovation's disadvantage.") (quotation omitted). I find, however, that Port-a-Pour did not demonstrate a likelihood of success on the trade secrets claim as to the Lo-Pro 1100,

the Peak-Matrix PB, or Peak's concrete batch plants for the same reasons discussed above in connection with the breach of contract claim.

43.   Also, and as discussed in the previous section relating to the breach of contract claim, I reject Defendants' argument that the disclosure of Port-a-Pour's drawings at issue in the case evidence a lack of sufficient care on the part of Port-a-Pour to protect its information or that this shows that Port-a-Pour was aware that this information was widely known and available in the industry.  First, the Licensing Agreement states specifically that "If some of the information transmitted by Licensor to Licensee is information previously or otherwise known to Licensee, this fact alone shall not derogate the trade secret and proprietary nature of the entire body of information to be transmitted under this Agreement from Licensor to Licensee."  (Ex. 3, ¶1.02.)  This provision is consistent with Mr. Doherty's testimony that at the time Port-a-Pour provided the drawings to Peak, it had an "understanding in principle" about the confidentiality of the drawings; namely, that Port-a-Pour would let Peak and Mr. Nelson see the drawings and work with them until they had a signed agreement.  (Tr. 193:7-13.)  He further testified that the Confidentiality and Nondisclosure Agreement dated April 13, 2006 (Ex. 4) memorializes that agreement.  (*Id.* 193:14-18.)

44.   In conclusion, I find that Port-a-Pour has met its burden of showing a likelihood of success on its claim for misappropriation of trade secrets delivered to Peak under the Licensing Agreement.  It has shown for purposes of the preliminary injunction motion that Peak used Port-a-Pour's trade secrets to the detriment of Port-a-Pour after the Agreement's termination by offering competing horizontal silos, including the Lo-Pro 6-11/6-12 and Lo-Pro 1600.

Patent Infringement—Chemical Metering System

45.   I next consider whether Peak's offer to sell a chemical metering system, which system was depicted in a picture on Peak's website during the fall of 2013, literally infringes the '886 Patent.

46.   As the moving party, Port-a-Pour establishes a likelihood of success on the merits if it can show, in light of the presumptions and burdens that will inhere at trial on the merits, (1) Port-a-Pour will likely prove that Peak infringes the '886 Patent; and 2) Port-a-Pour's infringement claim will likely withstand Peak's challenges to the validity and enforceability of the '886 Patent. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

47.   When considering a motion for preliminary injunction, the Court is not required to engage in a comprehensive and final claim construction. *Voile Mfg. Crop. V. Dandurand*, 551 F. Supp. 2d 1301, 1304 (D. Utah 2008) (citing *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.,*74 F.3d 1216, 1221 (Fed. Cir. 1996)).

48.   I received testimony from Neil Oberg, one of the co-inventors of the '886 Patent.  In addition, I received the '886 Patent, as well as a photograph of the chemical metering system offered in the Fall of 2013 on Peak's website.  (Ex. 8, p. 1).  I also received a picture of the patented chemical metering system built by Port-a-Pour.  (*Id*., p. 2).  Mr. Oberg and Mr. Doherty testified as to the nature of the chemical metering system, as well as the characteristics of the Peak system and how those characteristics were identical to the Port-a-Pour system.

49.   Mr. Oberg testified credibly that Peak offered a chemical admixture system on its web site in the Fall of 2013.  (Tr. 65:23-66:5.)  In addition, Mr. Oberg testified

credibly that the chemical admixture system depicted on the Peak website in the Fall of 2013 is identical to Port-a-Pour's chemical metering system.  (*Id.* 66:6-68:4.)  Finally, Mr. Oberg testified that the drawings and specifications necessary to build the chemical metering system were provided to Peak.  (Tr. 67:15-25; *see also* Ex. 8, pp. 3-4.)  I also heard credible testimony from Mr. Doherty, the other co-inventor of the '886 Patent, that Peak's chemical metering system depicted on its web site infringes the '886 Patent.  (Tr. 184:8-185:4.)

50.   Moreover, as discussed in connection with the breach of contract claim, Peak's interrogatory responses, taken together, support a finding for purposes of the preliminary injunction motion that (a) Peak continues to offer products with a chemical metering system, and (b) that while Peak has been "planning" to design a new chemical metering system, it has not yet done so.  I find, based on the foregoing evidence, that Peak continues to offer products with a chemical metering system that infringes the '886 Patent.  This satisfies the first prong of the *Amazon.com* test.

51.   The second prong is whether Port-a-Pour's infringement claim is likely to withstand Peak's challenges to the validity and enforceability of the '886 Patent "in light of the presumptions and burdens that will inhere at trial on the merits."  *Amazon.com*, 239 F.3d at 1350.

52.   I note that Defendants made no argument for the invalidity of either Patent in their Response in Opposition to Plaintiff's Motion for Preliminary Injunction (ECF No. 44.)  Thus, the issue may be waived at this juncture.  Even if I were to consider the issue, I find that Defendants have not met their burden as to any challenge to the Patents' validity.  The presumptions and burdens that will inhere at trial as to Peak's

challenge to the '886 Patent are significant.  In the Supreme Court's words, "'[a] patent shall be presumed valid' and '[t]he burden of establishing invalidity ... rest[s] on the party asserting such invalidity.'"  *Microsoft Corp. v. i4i Ltd. P'ship*, ___ U.S. ___, 131 S. Ct. 2238, 2243 (2011) (quotation omitted).  A defendant seeking to overcome the presumption of validity "must persuade the factfinder of its in-validity defense by clear and convincing evidence."  *Id.*

53.   In support of its burden to demonstrate invalidity under a clear and convincing standard, Peak offered very little evidence.  Peak introduced evidence of a competing product known as the BadgerMeter.  (*See* Tr. 119-122; Exs. D-19, D-20.)  In addition, Defendants elicited testimony from Mr. Oberg that both the BadgerMeter and the Port-a-Pour patented chemical metering system have similar components (a motor, a pump and a meter) (Tr. 120:3-10); that, in general, chemical metering systems are "very common" (*id.* 122:11-12); and that chemical metering systems generally have the basic functions of pumping and measuring fluids (*id.* 122:13-16).  But the fact that the Port-a-Pour patented chemical metering system bears at least a superficial resemblance to competing products, and the fact that the purpose of all chemical metering systems is to meter out chemicals, does not permit the Court to infer that the '886 Patent is invalid—let alone satisfy the "clear and convincing" standard required to overcome the '886 Patent's presumption of validity.

54.   Accordingly, I find, based on the record before the Court, that Port-a-Pour has satisfied the second prong of the *Amazon.com* test; namely, that Port-a-Pour's infringement claim will likely withstand a challenge to the validity of Port-a-Pour's '886 Patent.  I also find that since Port-a-Pour has presented evidence to satisfy both prongs

of the *Amazon.com* test, it has established a likelihood of success on the merits as to its claim of Peak's infringement of the '886 Patent.

Other Claims

55.   While Port-a-Pour also asserts that it has established a likelihood of success on the merits as to its Lanham Act claims of trademark infringement and violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. §1125(d), I note that the conduct complained of by Port-a-Pour as to those claims has ceased.

56.   Specifically, while it is clear from the evidence that Peak continued using the Port-a-Pour trademark without permission after the Licensing Agreement was terminated, based on the photographs of products offered for sale by Peak with the name Port-a-Pour on them, Peak is no longer offering these products for sale.  Indeed, the photograph of the last product offered for sale with the Port-a-Pour name on it was removed with the permission of the Court after the hearing, per Mr. Nelson's Affidavit filed on March 6, 2014.  Also, while Peak undisputedly redirected the URL—www.Port-a-Pour.com—to its website after the termination of the Licensing Agreement to try to take advantage of the money Peak invested in promoting Port-a-Pour (Tr. 342:22-343:20), this conduct has also ceased.

57.   Nonetheless, I am concerned about Peak's conduct in regard to these claims.  In June 2013, when this case was filed, Port-a-Pour moved for a temporary restraining order ["TRO"] and presented evidence that Peak used Port-a-Pour's Trademark in photographs throughout its website.  Peak removed these photographs from its website shortly before the TRO hearing.  Based substantially on the representations of Peak and its counsel that Peak would no longer advertise "Port-a-

Pour" branded equipment, *i.e.*, there was nothing to enjoin, I denied Port-a-Pour's motion for a TRO. However, at the hearing on Port-a-Pour's preliminary injunction, the evidence revealed that Peak still had a photograph with a "Port-a-Pour"-branded Auxiliary Silo in an online advertisement for its Lo-Pro 1600. (Ex. 36.) To learn that Peak did not stop advertising "Port-a-Pour" branded equipment, despite its representation to the Court at the TRO hearing, is disturbing.

58. When asked about this issue at the hearing, Defendants' counsel stated that they did not oppose an injunction against Peak's use of Port-a-Pour's Trademark so long as it is narrowly tailored to enjoin Peak from selling any product that uses the words "Port-a-Pour." (Tr. 402:8-24.) I will issue such injunctive relief, as it is unopposed and I find it to be appropriate in light of the foregoing.

D.   Threat of Irreparable Injury

59. The irreparable injury that Peak's alleged misappropriation and illegal use of Port-a-Pour's designs inflicts on Plaintiff lies at the heart of this case. By way of background on that issue, I note that Peak hired its first employee in December 2005 (Tr. 257:9-13), and thus appears to have been a start up company at that time. To enter the industry, Peak had to choose between developing its own products, branding and know-how or licensing someone else's. Peak chose to license the right to sell Port-a-Pour's products with the explicit understanding that Port-a-Pour is the sole owner of those products and Peak's rights are confined to the license. This allowed Peak at the outset to avoid the expense, time and risk of development of its own concrete batch plant and

related products.[6]  It also allowed Peak to begin building and selling products immediately.  Indeed, the evidence shows that within two months of signing the Licensing Agreement, Peak sold its first plant (Tr. 312:2-10), and sold 13 more plants for approximately $300,000 each.  (*Id.* 264:19-22.)

60.  Despite Peak's agreement that its rights to Port-a-Pour's products and proprietary information related to same would terminate and revert to Port-a-Pour upon termination of the Licensing Agreement (Ex. 3, ¶¶ 4.01(b), 4.03), the evidence shows that Peak continued to use those rights illegally as discussed in connection with the likelihood of success factor.  By doing so, Peak usurped Port-a-Pour's business, as people ended up talking to Peak about the Port-a-Pour products and Port-a-Pour lost valuable leads.  (Tr. 216:1-6)  Further, Peak's conduct made it impossible for Port-a-Pour to license its product line to anyone else because, according to Mr. Doherty, "people don't want to invest money and find out there's sort of a left-handed licensee out there".  (*Id.* 216:7-14.)  I find that this demonstrates irreparable injury.

61.  I am guided by Judge Blackburn's reasoning in a similar case, which I find persuasive.  In discussing the irreparable injury element where, as here, the licensee usurped the licensor's business after the termination of the license, Judge Blackburn found:

> New Pro has demonstrated also that it will suffer irreparable injury absent an injunction. New Pro has shown that the defendants have been involved in several unauthorized uses of New Pro's trademark, New Pro's copyrighted

---

[6] As Port-a-Pour showed at the hearing, creating a new line of products in an industry is extremely costly and takes years of trial and error.  Peak itself experienced this issue when it attempted to develop a powder silo built from a shipping container— which, according to Nelson, has no market.  (Tr. 344:16-345:19.)

language, and likely use of New Pro's trade secrets, to the extent the trade secret information is relevant to the promotion and distribution of products using New Pro's protected intellectual property. New Pro's trademark, copyrights, and trade secrets are essential components of New Pro's business, in Colorado and elsewhere. The defendants' appropriation of New Pro's intellectual property likely has had and will have an immediate, substantial, and harmful impact on New Pro's business in Colorado. . . .In short, if the defendants are permitted to continue their misappropriation of New Pro's intellectual property, then New Pro's relationships with other distributors and potential Colorado customers will be harmed. Such injury cannot fully be compensated with monetary damages.

*New Pro Publications v. Links Media Group, L.L.C.*, No. 07–cv–02230–REB–BNB, 2007 WL 4115995, at *4 (D. Colo. Nov. 16, 2007).

62. I also find instructive a number of cases from other Districts dealing with a similar fact pattern to this case, *i.e.,* in which a licensee continues to misuse licensed intellectual property rights after the termination of the license. *See Mobius Medical Systems, LP v. Sun Nuclear Corp.*, No. 4:13-CV-3182, 2013 WL 6498981, at *11-15 (S.D. Tex. Dec. 10, 2013) (computer software trade secrets); *Bad Ass Coffee Company of Hawaii, Inc. v. Bad Ass Coffee Ltd. Partnership*, No. 2:99-CV-01050, 2000 WL 33710901, at *6-9 (D. Utah Feb. 24, 2000) (trademarks); *TM Computer Consulting, Inc. v. Apothacare, LLC*, No. 08-6267-HO, 2008 WL 4238913, at *6-10 (D. Or. Sept. 11, 2008) (trademarks and cybersquatting). In those cases, the court found irreparable injury and granted injunctive relief. Indeed, as one of those courts noted, "'[w]hen a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed.'" *Mobius Med. Systems*, 2013 WL 6498981, at *14 (quotation omitted).

63. The right to use one's property as one wishes—either to use the property to its own advantage, to exclude another from its use, or to sell, lease, license or transfer

such property to another—is fundamental, and being excluded from the rights inherent in one's property constitutes irreparable injury. *See Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) (impairment of exclusivity in patent rights supports finding of irreparable injury); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1148 (Fed. Cir. 2011) (noting as basis for finding irreparable harm "the fundamental nature of patents as property rights granting the owner the right to exclude"); *Won-Door Corp. v. Cornell Iron Works, Inc.*, – F. Supp.3d -, 2013 WL 5503188 (D. Utah Oct. 3, 2013) (noting that "[t]he Federal Circuit has recognized that 'the existence of a two-player market may well serve as a substantial ground for granting an injunction—e.g., because it creates an inference that an infringing sale amounts to a lost sale for the patentee....'") (quotation omitted); *Layne Christensen Co. v. Bro-Tech Corp.*, 871 F. Supp. 2d 1104, 1116 (D. Kan. 2012).

64.  Based on the foregoing, I find that Port-a-Pour has carried its burden to establish the threat of irreparable injury in the absence of a preliminary injunction.

E.     Balance of Harms

65.  "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).

66.  I find that the balance of harms tilts in favor of Port-a-Pour.  In the first place, Peak has presented little evidence of harm it will suffer if the injunction requested by Port-a-Pour is issued.  Indeed, in the letter acknowledging the termination of the

License, Peak states that it "intends to build and sell products that [Peak] has developed and for which it has found a market." (Ex. 30.)  Peak is free to do exactly that—except that Peak may not continue to sell any infringing products.  (*See* Tr. 248:9-12.)

67.  Moreover, I can give no weight to harm Peak might sustain by an injunction against selling *infringing* products.  *See Bigfoot*, 167 F. Supp. 2d at 1127 (defendant who knew of trademark infringement but took no corrective action should not be heard to complain of expenses that could have been avoided); *see also TM Computer Consulting Inc. v. Apothacare*, *LLC*, No. 08-6267-HO, 2008 WL 4238913, at **9-10 (D. Or. 2008) (in similar case in which licensee continued to misuse licensor's rights after termination of license, finding balance of harms favored licensor because "grant of a preliminary injunction only will prevent defendants from doing what they are not authorized to do").

68.  Accordingly, I find that the balance of harms favors Port-a-Pour.

F.     Public Interest

69.  The public interest is served by enforcement of intellectual property rights, and the further confusion of the public.  Judge Babcock of this Court stated the matter succinctly in *Bigfoot* as follows:

> Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused. Having established a likelihood of consumer confusion created by the concurrent use of the Bigfoot marks, it follows that if such use continues, the public interest would be damaged. Conversely, a prohibition upon Defendants use of the mark would eliminate that confusion. I therefore conclude that a preliminary injunction is in the public interest.

*Bigfoot*, 167 F. Supp. 2d at 1228 (quotation marks and citations omitted).

70. I also find instructive the discussion by another court of the public interest

in similar circumstances, *i.e.,* where a former licensee continued to misuse licensor's

rights after license had expired:

> In this instance, entry of a preliminary injunction would serve the public interest by enforcing valid contractual provisions freely entered into by the parties, by promoting stability and certainty in business relationships, by enforcing noncompete covenants permissible under Florida law, by preventing confusion as to a trademark owner's rights to control the use of its marks, and by protecting confidential, proprietary and trade secret information of businesses.

*Medi-Weightloss Franchising USA, LLC v. Medi-Weightloss Clinic of Boca Raton*, No.

8:11-cv-2437-T-30MAP, 2012 WL 260902 at *9 (M.D. Fla. Jan. 3, 2012).

71. Based on the foregoing, I find that the public interest does not preclude an

injunction.

G.    The Injunctive Relief Afforded

72. I find from the foregoing that Port-a-Pour has satisfied all four elements

required for a preliminary injunction. Accordingly, I will grant Port-a-Pour's preliminary

injunction motion. Defendants Mark Nelson and Peak Innovations, Inc., its officers,

directors, employees, agents and representatives, are enjoined from:

a.    The manufacture, sale, advertisement of, or offer for sale the following horizontal silos derived from the Port-a-Pour Auxiliary Silo: the Lo-Pro 1600, Lo-Pro 6-11 or 6-12, either as standalone products or as components of plants;

b.    The manufacture, sale, advertisement of, or offer for sale of any chemical metering system infringing on the '886 Patent, including, without limitation, the chemical metering system depicted on Peak's web site in the fall of 2013, or any product including or incorporating such a chemical metering system;

    c.    The sale, advertisement of, or offer for sale of any product bearing the "Port-a-Pour" Trademark, or any other use of such trademark.

H.    <u>Rule 65 Bond</u>

73.  Fed. R. Civ. P. 65 requires the moving party to post a bond to protect the interests of the defendants as a condition to enforcement of a preliminary injunction. Port-a-Pour has offered a cash bond of $10,000.00.  In support of this amount, Port-a-Pour notes the egregious nature of Defendants' violations of Port-a-Pour's intellectual property rights as well as the substantial likelihood of success on the merits.

74.  "District courts have 'wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm.'" *Heisman Trophy Trust v. Smack Apparel Co.*, 595 F. Supp. 2d 320, 329 (S.D.N.Y. 2009) (quotation omitted); *see also New Pro*, 2007 WL 4115995, at *5 (bond of $300.00 in similar circumstances).

75.  Here, just as in the *Heisman* case, Defendants have offered little to no proof of any likelihood of harm or damages they might sustain if wrongfully enjoined, nor have they made a request for a bond in any amount higher than $10,000.00.

76.  The Court exercises its discretion to set the bond at $10,000.00. The preliminary injunction described herein will take effect upon Port-a-Pour's filing of a bond in this amount with the registry of the Court.

III.    <u>CONCLUSION</u>

Based upon the foregoing, it is

ORDERED that Plaintiff's Motion for Preliminary Injunction (ECF No. 35) is

**GRANTED IN PART AND DENIED IN PART** as set forth herein.    It is

FURTHER ORDERED that Defendants Mark Nelson and Peak Innovations, Inc.,

its officers, directors, employees, agents and representatives, are enjoined from:

a.   The manufacture, sale, advertisement of, or offer for sale the following horizontal silos derived from the Port-a-Pour Auxiliary Silo:  the Lo-Pro 1600, Lo-Pro 6-11 or 6-12, either as standalone products or as components of plants;

b.   The manufacture, sale, advertisement of, or offer for sale of any chemical metering system infringing on the '886 Patent, including, without limitation, the chemical metering system depicted on Peak's web site in the fall of 2013, or any product including or incorporating such a chemical metering system;

c.   The sale, advertisement of, or offer for sale of any product bearing the "Port-a-Pour" Trademark, or any other use of such trademark.  It is

FURTHER ORDERED that Plaintiff shall post a $10,000 bond before the

preliminary injunction takes effect.

Dated:  June 17, 2014

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge