# AGREEMENT

**THIS AGREEMENT** is made effective as of February 1, 2006, by and between **PORT-a-POUR, INC.,** a Colorado corporation, having an address of P.O. Box 438, Berthoud, Colorado 80513, U.S.A. (hereinafter called **"Licensor" or Port-a-Pour"**), and **PEAK INNOVATIONS, INC.,** a Colorado corporation of 1115 S. Garfield Avenue, Loveland, Colorado 80537 (hereinafter called **"Licensee" or "Peak"**).

## RECITALS:

Port-a-Pour, Inc. is the owner of trade secrets and other proprietary information relating to a portable batch plant for making concrete, and plant support equipment (which products are referred to herein and in any documents related hereto as **"Agreement Product" or "Products"**).

Peak desires and intends to acquire certain rights to manufacture and sell the Products including batch plants and plant support equipment in the territory consisting of the United States and Canada.

**NOW THEREFORE,** in consideration of the payments recited herein and of the mutual covenants and agreements herein set forth, Peak and Port-a-Pour agree as follows:

## ARTICLE 1
### Definitions

The following terms shall, as used in this Agreement, have the meanings hereinafter set forth:

1.01.   The term "Agreement Products" means any product in which Port-a-Pour has a protected proprietary interest, including without limitation, any product disclosed in trade secrets or other information disclosed to Peak, specifically including trade secrets and proprietary information contained in the Confidentiality and Non-Disclosure Agreement entered into by and between the parties of even date (the **"Confidentiality Agreement"**).

1.02.   The term "trade secrets" means all that information, drawings, data, architectural specifications and the like (herein collectively called "information") known from time to time by Licensor relevant to the manufacture, use, sale and assembly of a mobile concrete batch plant, including all information, drawings, data, software, source code, design specifications, wiring diagrams, blending systems, and other specifications related to Agreement Products, which is contemplated to be transferred to Licensee by Licensor in order to enable Licensee to manufacture, use, sell and assemble the mobile concrete plant.  If some of the information transmitted by Licensor to Licensee is information previously or otherwise known to Licensee, this fact alone shall not derogate the trade secret and proprietary nature of the entire body of information to be transmitted under this Agreement from Licensor to Licensee.

1

1.03.     The Agreement Products shall include a "control system" which shall mean those items of electronic hardware and software including any computer components which form the essential system for operating and controlling the mobile concrete plant.

1.04.     The term "territory" or "designated territory" shall mean the fifty (50) states of the United States of America and the country of Canada.

## ARTICLE 2
### License Grant

2.01.     Licensor hereby grants to Licensee the indivisible, and non-assignable (except as provided herein) right and license to make, use, sell and assemble Agreement Products in the designated territory.

2.02.     During the term of this Agreement and so long as Licensee is not in default with respect to any of its obligations to Licensor under this Agreement, Licensor shall not grant any further rights and/or licenses to any business having any place of business in the designated territory. Certain rights of Licensor are retained and reserved to it in this Agreement, including the right to give rights or otherwise deal with manufacturers outside of the designated territory, in accordance with the provisions of this Agreement.

## ARTICLE 3
### Licensing Fees and Performance

3.01.     Licensee has paid to Licensor the sum of FIFTY THOUSAND and 00/100 U.S. DOLLARS ($50,000.00), no part of which shall be refundable in the event of any cancellation or termination of this Agreement.

3.02.     As additional consideration for the rights and licenses granted and the disclosure and assistance of Licensor, Licensee shall pay to Licensor the amount of FIFTY THOUSAND and 00/100 DOLLARS ($50,000.00) per unit on the first two (2) mobile batch plant units sold or rented by Licensor, by Licensee, or by an authorized third party, and the sum of TWENTY THOUSAND and 00/100 DOLLARS ($20,000.00) per unit on all subsequent units rented, capitalized, or sold by Licensee, Licensor, or an authorized third party.

3.03.     Licensee shall manufacture at least two (2) units in the first year (February 1, 2006 through March 1, 2007) and Licensee shall pay Licensor the sum of at least ONE HUNDRED THOUSAND and 00/100 DOLLARS ($100,000.00) for such units ($50,000.00 per unit) prior to March 1, 2007. (It shall pay $20,000.00 per unit after the first two (2) units). It shall pay license fees to Licensor for at least five (5) units in the second year (March 2, 2007 through February 28, 2008), and it shall pay license fees to Licensor for at least eight (8) units per year for each of the following ten (10) years. License fees paid in excess of the minimum for any one (1) year period will be credited toward any additional minimum licensing fee requirements due in subsequent years. If Licensee fails to pay the annual minimum licensing fees as set forth in this paragraph in a timely and complete fashion, then the rights granted to Licensee may be terminated in accordance with provisions of this Agreement.

2

3.04.     Licensee shall forthwith after February 1, 2006, build at least two (2) units, and will maintain at least two (2) completed units as inventory at all times while this Agreement is in existence.

3.05.     The Agreement Products shall be considered as sold when invoiced, or rented as of the date of the Rental Agreement, and capitalized as of the date when any funds are realized from capitalization are received, and the licensing fee shall be due and payable to Licensor not later than thirty (30) days after any of these events. If Agreement Products are to be manufactured and used by Licensee, then the licensing fee shall be due at the time of completion of manufacture.

3.06.     On or before the 15th day of each three month period (the **"Quarter"**) commencing the first Quarter after February 1, 2006 (the first quarter date is May 15, 2006), Licensee shall deliver to Licensor an informational statement showing information as to any sales, rentals and/or capitalization, and such other information regarding units in progress, status of manufacturing, status of sales, and dealings with the Agreement Products as may be required by Licensor, acting reasonably. The Licensor shall have the right to conduct an audit of Licensee's records.

3.07.     Licensee shall keep accurate records as shall be necessary for the determination of licensing fees payable hereunder to Licensor and Licensee shall make such records available to Licensor promptly upon request.

3.08.     All sums not received by Licensor on the due date shall bear interest at the rate of fifteen percent (15%) per annum commencing on the date when such funds are due until such funds are paid to Licensor. Licensee further agrees to pay all attorney's fees and all costs and other expenses incurred by Licensor in enforcing the terms of this Agreement.

3.09.     In the event of any sales by a manufacturer outside of the designated territory whereby the unit which is the subject of the sale shall be used within the designated territory, Peak shall be entitled to a royalty fee of TWENTY THOUSAND and 00/100 DOLLARS ($20,000.00), which fee shall be in addition to a TWENTY THOUSAND and 00/100 DOLLARS ($20,000.00) license fee payable to Port-a-Pour by the manufacturer outside of the designated territory.

3.10.     The sale of any unit by Peak to a buyer outside of the designated territory shall be subject to the express written consent of Port-a-Pour, which consent if granted, would include payment of an appropriate license fee ($50,000.00 or $20,000.00 as may be appropriate under 3.02 and 3.03) to Port-a-Pour.

3.11.     On all units manufactured by the Licensee, Licensee will grant an express one (1) year manufacturer's warranty which will generally provide for replacement parts, and service and repair of included items on the unit.

3.12.     Port-a-Pour agrees to provide drawings sufficient to allow Licensee to effectively fabricate a complete operating plant; it will also provide technical assistance to Licensee to enable it to build and complete the first two (2) batch plants; it will also assist Licensee in setting up a sales program, and at the discretion and authorization of Licensee, it will

3

assist in handling sales on a commission basis. Additionally, Port-a-Pour shall assist in technical consultation and on site technical consultation for concrete production service until May 1, 2007 without additional compensation. Port-a-Pour shall also assist Licensee in employee training and oversight for a one (1) year period and will assist Licensee in developing a purchasing department and a purchase journal including a list of vendors who assist in providing parts or services for the manufacture of the unit.

## ARTICLE 4
## Termination

4.01(a).   If Licensee shall default in the performance of any covenant herein contained, then Licensor may notify Licensee in writing of such default, stating in such written notice the covenant or covenants of this License Agreement which Licensee shall have defaulted in, and Licensee shall have fifteen (15) days after the service of such written notice, to cure such default. If Licensee shall fail to cure said default within said fifteen (15) day period, then Licensor may cancel and terminate this License Agreement by serving upon Licensee a written notice of such cancellation and termination thereof, which cancellation and termination shall be effective immediately upon service of the notice; provided, however, such termination shall not prejudice the right of Licensor to recover any licensing fees, interest, or other sums due at the time of such cancellation or termination and shall not prejudice any cause of action or claim of Licensor accrued or to accrue on account of any breach or default by Licensee. Interest on late payments as provided herein shall be due notwithstanding any right to cure the default as set forth in this Article 4.01(a).

4.01(b).   In the event of termination by Licensor, then all rights of Peak shall immediately be terminated and the license rights granted to Licensee shall immediately and completely revert to Licensor and Licensee will have no further rights under this Agreement except as may be expressly provided herein. Such termination shall not prejudice the right of Licensor to recover any amounts due from Licensee and in no event would any fees previously paid by Licensee to Licensor be refundable. Upon termination, Licensee shall have the right to sell all finished plants in the inventory and to finish plants which are in progress as defined herein. Plants in progress shall be identified by serial number and shall be considered "in progress" and available for sale if at least Twenty Five Thousand and 00/100 Dollars ($25,000.00) in labor and materials has been expended in direct costs related to the manufacture of each of such identified plants as of the time of termination. Peak shall have one (1) year after the date of termination to complete and to sell plants in progress as the date of termination. Peak shall use reasonable and best efforts to complete and sell such plants with one (1) year. If the plants are not sold in one (1) year by Peak, then Port-a-Pour shall purchase a maximum of two (2) such completed plants for the direct cost of labor and materials directly incorporated into such plant. Within thirty (30) days after termination, Licensee shall provide a written accurate audit of labor and materials directly made a part of such plant in progress, with complete back-up documentation and shall deliver it to Licensor. If such documentation is not timely and completely provided to Licensor, then Licensor shall have no obligation to purchase any plants in progress from Licensee.

Port-a-Pour will have three (3) years to pay for the plants with interest accruing monthly at a rate of five percent (5%) per annum.

4

Upon determination of the cost of such units by Licensor, Licensor will pay Licensee such costs over a period of three (3) years; interest shall be payable to Licensee in the amount of such determined cost at the rate of five percent (5%) per annum, which interest shall be payable monthly beginning sixty (60) days after the date of re-conveyance of the two (2) (or less) units which shall have been completed by Licensee but not sold within the one (1) year period. The total amount of such determined cost plus any accrued interest shall be paid by Licensee not later than three (3) years after the date of the re-conveyance. Licensor may prepay the amount in part or in full without penalty.

The two (2) (or less) units unsold by Licensee shall be re-conveyed to Licensor by a bill of sale, free and clear of all liens or other encumbrances of any kind within thirty (30) days after the end Licensee's period to sell plants in progress; if such re-conveyance is not timely and completely made by Licensee, then any obligation of Licensor to repurchase the units shall be null and void. Upon sale of any such re-conveyed units by Licensor, any balance due to Licensee on such unit would be paid in full at the time of sale. (If there are any sale proceeds exceeding the balance due on such unit, the proceeds shall belong to Licensor). Licensee shall also have a security interest in the re-conveyed units until the balance is paid in full.

4.02.   In case Licensee shall become adjudicated a bankrupt or consent to or have a Court order the appointment of a receiver for all or a substantial part of its property, which appointment shall not be dismissed within thirty (30) days, or make an assignment or composition for the benefit of creditors, such Receiver or the Trustee in Bankruptcy, as the case may be, is automatically bound by all the terms and conditions of this Agreement, unless Licensor shall, upon notice thereof, elect otherwise within twenty (20) days of the delivery of such notice. Licensor shall have no obligation to repurchase inventory under the conditions of this paragraph 4.02.

4.03.   Except any repurchase provisions as set forth in paragraph 4.01(b), above, upon any cancellation or termination of this Agreement, Licensee shall have no further rights of any kind under this Agreement. Upon any cancellation or termination hereof, Licensee shall forthwith deliver to Licensor any and all drawings, specifications, models, brochures, documents and/or other property previously received from Licensor.

### ARTICLE 5
### Miscellaneous

5.01.   In all acts, including the manufacture, use, sale or erection of Agreement Products by Licensee hereunder, Licensee shall be acting as an independent contractor. Licensor shall not be in any way responsible for any statement, warranty, representation, promise, commitment or other obligations made or assumed by Licensee or arising by operation of law to, with respect to or for, the benefit of third parties in connection with the manufacture, use or sale of Agreement Products or otherwise. Licensee agrees to indemnify and hold Licensor harmless from and against all liability, claims or demands made by a third party on account of any such obligations and shall pay all costs including without limitation, costs of investigation, legal and other professional fees, and expert witness fees; and Licensee shall, at its own expense, defend

any and all actions based thereon and shall pay all attorney's fees and all costs and other expenses arising therefrom. In this connection Licensee shall obtain and maintain in full force and effect a general liability policy of insurance to cover the reasonable award of damages which might arise out of any liability resulting from the manufacture, use or sale of Agreement Products with minimum coverage of not less than One Million ($1M) Dollars per person, and shall furnish Licensor with evidence of such insurance and proof of payment of premiums thereon as due; Licensor shall be named as an additional insured on such policy.

5.02(a).   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns; however, Licensee shall assign no rights hereunder without written consent of Licensor. In the event such consent to assign is given, Licensee will pay all legal and other costs incident to such assignment and Licensee shall remain liable for all obligations hereunder. Any and all rights of Licensor may be assigned by it.

5.02(b).   ~~In the event~~ Licensee desires to assign the manufacturing rights in this Agreement, then any assignment must provide for payment and reimbursement of development expenses to Port-a-Pour in the amount of TWO MILLION and 00/100 DOLLARS ($2,000,000.00), and any assignee of Licensee's rights must assume and agree to pay any and all license fees or other amounts due to Licensor under this Agreement. If the proposed assignment occurs after February 1, 2008, then the TWO MILLION and 00/100 DOLLAR ($2,000,000.00) reimbursement due to Port-a-Pour shall be increased in an amount equal to ten percent (10%) thereof for each twelve (12) month period thereafter beginning February 1, 2008. No such assignment shall be granted without the express written consent of Port-a-Pour, which will not be unreasonably withheld if the rights of Port-a-Pour are reasonably secured legally and financially under the terms of any assignment. ~~If Licensee desires~~ to sell or assign both the design and the manufacturing rights, then Port-a-Pour shall receive FIVE MILLION and 00/100 DOLLARS ($5,000,000.00) and Peak shall receive TWO MILLION and 00/100 DOLLARS ($2,000,000.00) (if the proposed assignment of design and manufacturing rights occurs after February 1, 2008, then these amounts shall be increased in an amount equal to ten percent (10%) thereof for each twelve (12) month period thereafter beginning February 1, 2008). ~~If Licensee desire~~s to assign its rights, and if the amount to be paid for such assignment is in excess of SEVEN MILLION and 00/100 DOLLARS ($7,000,000.00) (plus any annual ten percent (10%) increases), then the amount in excess of SEVEN MILLION and 00/100 DOLLARS ($7,000,000.00) (plus increases) shall be divided thirty percent (30%) to Peak and seventy percent (70%) to Port-a-Pour.

*[handwritten: Right of first refusal]*

5.03.   Any notice or communication required or permitted to be given to or served on either party hereto pursuant to this Agreement shall be sufficiently given or served when sent to such party by registered or certified United States mail as the case may be, return receipt requested, addressed to it at its address set forth below, and when sent to such party by telefax, addressed to it at the telefax number set forth below, or to such other address or such other telefax number as it shall designate by written notice given to the other party thereto and shall be deemed effective upon mailing and transmission thereof:

In case of notice to Licensor:    Port-a-Pour, Inc.
                                  Attn: Jerome J. Doherty, President
                                  P.O. Box 438
                                  Berthoud, Colorado 80513
                                  FAX: 970-532-0567

6

      In case of Notice to Licensee:      Peak Innovations, Inc.
                                                          Attn:  Mark E. Nelson, President

                                                          1115 S. Garfield Avenue
                                                          Loveland, Colorado 80537
                                                          FAX: 970-663-5542

      5.04.       This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter of this Agreement and merges and shall supersede all prior agreements, commitments, representations, writings and discussions between them; and neither of the parties shall be bound by any obligations, conditions, warranties, or representations with respect to the subject matter of this Agreement and the Confidentiality and Non-Disclosure Agreement, other than as expressly provided in this Agreement and the Confidentiality and Non-Disclosure Agreement or as duly set forth on or subsequent to the date hereof in writing and signed by the parties to be bound.

      5.05.       This Agreement shall be construed and governed under the laws of the State of Colorado, the United States of America.

## ARTICLE 6
### Illegality of Provisions

      6.01.       If any provision of this Agreement is hereafter deemed illegal, the remainder of the contract shall not be affected thereby.

**THE PARTIES AGREE** that all of the terms and conditions of this Agreement were entered into on the 14th day of April, 2006, with the Agreement and its terms and conditions to be effective February 1, 2006, notwithstanding the fact that signatures may have been made after such date.

                                                     **PORT-a-POUR, INC.** a Colorado Corporation

                                                     By: _/s/ Jerome J. Doherty_____
                                                   **Jerome J. Doherty, President**
                                                   P.O. Box 438
                                                   Berthoud, CO 80513
                                                   970-532-3761
                                                   970-532-0567 (Fax)

**ADDITIONAL SIGNATURE ON NEXT PAGE**

**PEAK INNOVATIONS, INC.,** a Colorado Corporation

By: _____/s/ Mark E. Nelson_____
**Mark E. Nelson, President**
1115 S. Garfield Avenue
Loveland, CO 80537
970-663-5100
970-663-5542 (Fax)
markenelson@attglobal.net

agreemen.port a port 3.06