IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   13-cv-01511-WYD-NYW

PORT-A-POUR, INC., a Colorado corporation,

      Plaintiff,

v.

PEAK INNOVATIONS, INC., a Colorado corporation, and
MARK E. NELSON, an individual

      Defendants and Counter Claim Plaintiffs

v.

PORT-A-POUR, INC. a Colorado corporation;
JEROME J. DOHERTY; and
NEIL G. OBERG, individuals,

      Counter Claim Defendants.

---

**ORDER ON SUMMARY JUDGMENT MOTIONS**

---

I.    <u>INTRODUCTION</u>

THIS MATTER is before the Court on the Motion for Partial Summary Judgment filed by Plaintiff Port-a-Pour, Inc. ("Port-a-Pour" or "Plaintiff"), Jerome J. Doherty ("Doherty") and Neil Oberg ("Oberg") on July 14, 2014, which I will refer to as Plaintiff's motion.  Also before the Court is Defendants' *Corrected* Motion for Partial Summary Judgment filed by Peak Innovations, Inc. ("Peak") and Mark Nelson ("Nelson") on July 25, 2014.  These motions are fully briefed.

II.    FACTUAL BACKGROUND

I note at the outset that I have considered all the facts alleged by the parties in their motions, as well as the response and reply as to these facts, even though I have not recited all the facts in this Order.  I discuss many of the facts related to the claims at issue in the motions in connection with my analysis of those claims.  I also note that legal argument made by a party opposing a summary judgment motion when disputing a fact is not sufficient to create a genuine issue of material fact, *see* Section III.B.7 of my Practice Standards, nor are facts stated in response that are extraneous to the dispute.  Also, conclusory allegations that are unsupported by evidence do not create a genuine issue of fact.  *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1237 (10th Cir. 2004).

Turning to the facts, it is undisputed that beginning in approximately 1984-1985, Doherty and Oberg, on behalf of Port-a-Pour, began developing concrete batch plants and related plant equipment.  They claim that they spent over 20 years developing proprietary designs for equipment that Port-a-Pour sold in the industry, including a portable low-profile concrete batch plant known as the "Series II".

Plaintiff asserts that Oberg prepared detailed AutoCAD drawings for Port-a-Pour's concrete batch plant and related equipment (the "Drawings"), and developed plant software to run the concrete batch plant (the "Plant Software").  Further, it contends that Oberg developed programming to control the programmable logic circuits ("PLCs") that control various components of the concrete batch plant and related equipment (the "PLC Programming").  Oberg and Doherty also developed parts lists for the materials and parts to build Port-A-Pour's equipment, and vendor lists to obtain the

-2-

parts to build the products.  Finally, Plaintiff alleges that Oberg and Doherty developed specifications for the functioning of the concrete batch plant and horizontal silo, such as the power of motors, gear ratios, filter specifications, belt thickness, roller sizes, and hundreds of additional specifications necessary to properly build a functioning plant (the "Specifications").  Plaintiff collectively refers to the Drawings, Plant Software, PLC Programming, Lists and Specifications as the "Proprietary Information."

Defendants dispute in part the facts in the previous paragraph.  They assert that the drawings were "schematic drawings" that left out many details needed to build an operating plant and/or were incoherent and conflicting.  While they acknowledge that Oberg developed software and PLC Programming "of some sort", they deny that the software was functional at the time the licensing agreement was entered.  They also deny that the PLC Programming worked at the outset.  Further, they assert that Peak developed its own software, through several iterations and improvements, at a cost of $384,000.00.  Defendants also dispute that the vendor and parts lists were adequate. Finally, they assert that any specifications Oberg developed were grossly inadequate and insufficient to build a batch plant.  I find from Defendants' response that it is undisputed that Oberg and Doherty developed these products and provided them to Peak.  However, I find that there is a genuine issue of material fact as to the adequacy or usefulness of these products to Peak.[1]

---

[1] Defendants also dispute Port-a-Pour's definition of "Proprietary Information", but this does not create a genuine issue of material fact as to whether the information was provided to Peak.

It is undisputed that Peak and Nelson, on the one hand, and Port-a-Pour, on the other hand, began negotiating agreements between the parties in late 2005.[2]  It is also undisputed that the parties entered into a Confidentiality Agreement on April 13, 2006 and a Licensing Agreement on April 14, 2006 (collectively the "Agreements").  The Licensing Agreement stated that Port-a-Pour "is the owner of trade secrets and other proprietary information relating to a portable batch plant for making concrete, and plant support equipment", referred to as "Agreement Products", and that Port-a-Pour granted to Peak "the indivisible, and non-assignable. . . right and license to make, use, sell and assemble Agreement Products in the designated territory."  (Pl.'s Mot. Partial Summ. J. ["Pl.'s Mot."], Ex. 1, Recitals and  ¶¶ 1.02, 2.01.)

Further, it is undisputed that Port-a-Pour provided technical support to Peak, which it asserts enabled Peak to build the first two batch plants.  Peak disputes this, arguing that while Port-a-Pour provided design input into the Series II batch plant, the initial information it provided was inaccurate, incomplete or unreliable, and when clarification was sought, the responses provided by Doherty and Oberg were sometimes conflicting.  Thus, I find that there is a genuine issue of material fact as to the adequacy or reliability of the technical support provided by Port-a-Pour.

On April 7, 2006, an order was received by Port-a-Pour for a Series II batch plant to be deployed in British Columbia, Canada, and used to build facilities for the Winter Olympics (the "Emil Anderson Plant").  In June 2006, less than two months after entering

---

[2] While Plaintiff originally claimed that the negotiations began in February 2006, it did not object to Defendants' assertion that the negotiations began in late 2005.

into the Agreements, Peak built and delivered a functioning portable concrete batch plant; namely, the Emil Anderson Plant.[3]

Plaintiff asserts that Peak built 15 "Series II" portable concrete batch plants under the License using the Proprietary Information and the '886 Patent, and that it sold at least 14 of those for approximately $300,000 apiece.  Defendants admit that Peak built fifteen Series II plants, and sold, rented, or capitalized fourteen of them.  This fact is thus undisputed.  Defendants assert, however, that one of those plants was not sold, rented or capitalized; instead, it was cannibalized for parts and eventually scrapped for lack of demand.  This is, however, extraneous argument that does not refute the fact as alleged by Plaintiff nor does it demonstrate the existence of any genuine issue of material fact.

It is undisputed that Port-a-Pour assisted Peak with sales, and, indeed, sold the first eight plants and accompanying related plant equipment that Peak built under the license.  Plaintiff asserts that Peak generated $4 to 4.5 million in revenues from selling its products under the License, and paid approximately $340,000 to Plaintiff in licensing fees during the term of the License.  Defendants admit in response, and it is thus undisputed, that Peak paid $340,000.00 in licensing fees for 14 batch plants.[4]  They dispute that the revenues for the sale of Series II plants were $4 to 4.5 million, arguing they were substantially lower.  They do not, however, provide evidence that directly

---

[3] Defendants dispute this in part, admitting that the written order for the Emil Anderson plant is dated April 7, 2006, but asserting that work on that plant was begun on "spec" in January of 2006.  I agree with Plaintiff that this additional assertion does not refute the facts alleged by Plaintiff, nor demonstrate the existence of any genuine issue of material fact.  Thus, I deem the facts in this paragraph undisputed.

[4] Defendants assert that this was payment in full for the 14 plants Peak build and sold, rented, or capitalized.  They also assert that Peak ultimately lost money on most of the Series II plants it built.  This is, however, argument that does not refute the fact as alleged by Plaintiff.

refutes the testimony of Nelson at the injunction hearing cited by Plaintiff that Peak

received 4 to 4.5 million in revenues from the sale of Port-a-Pour equipment under the

Licensing Agreement.  (Tr. of Prelim. Inj. Hr'g ["Inj. Tr."], ECF No. 70, at 195:12-15.)

Thus, I also find this fact to be undisputed for summary judgment purposes.

       According to Plaintiff, Peak also built and sold numerous horizontal silos of

various sizes and configurations under the License using the Proprietary Information.

While Defendants admit that Peak built and sold horizontal silos, they assert that such

silos are not mentioned in the Licensing Agreement.  Defendants also dispute that the

horizontal silos were built using Port-a-Pour's "Proprietary Information".  However, I

previously found as a matter of law based on my interpretation of the Agreements that

the drawings provided by Port-a-Pour to Peak related to the Series II and the Auxiliary

Silo are protected under the Agreements as proprietary, and that the Auxiliary Silo is

encompassed within the Agreements.  (Findings of Fact and Conclusions of Law, ECF

No. 122, [hereinafter "Prelim. Inj. Order"] at § III, ¶¶ 11-13.)[5]  Thus, the only dispute in

connection with the facts alleged by Plaintiff in this paragraph is whether Defendants

built the horizontal silos using Plaintiff's Proprietary Information.

       Finally, Plaintiff asserts that Peak offered for sale and built and sold other

concrete batch plants and related equipment under the License using the Proprietary

Information (the "Derivative Offerings").  Defendants dispute this, noting that since filing

suit, Port-a-Pour has not requested nor has it carried out any physical inspection of

---

[5] While my evidentiary findings at the preliminary injunction hearing are not binding at this stage of
the litigation, as discussed in more detail below, findings made as a matter of law based on interpretation
of the contracts are binding.

Peak's batch plants or the equipment accused of violating Plaintiff's patents and trade secrets.  This does not, however, directly refute Plaintiff's assertion.  Defendants also note that Doherty, on behalf of Port-a-Pour, acknowledged that Peak independently developed its batch plants, citing a letter to Peak stating in pertinent part:

> I don't think the Peak plant is very similar to the Port-A-Pour and since we didn't participate in the design, I don't think there would be a royalty due . . . . Port-A-Pour spent the most time and money developing and patenting the chemical metering system. . . . A royalty of $2000.00 per metering system seems reasonable . . .

(Def.'s Mot. Partial Summ. J., ECF No. 141 ["Defs.' Mot."], Ex. 8.)  I find from this that there is a genuine issue of material fact as to whether Peak's plants were built using Plaintiff's Proprietary Information.

Peak advertised the Derivative Offerings and horizontal silos with several different-sized bins as "Port-a-Pour" products during the term of the License.  While Defendants dispute Plaintiff's definition of the term "Derivative Offerings", this allegation is otherwise undisputed.

Plaintiff alleges that Peak failed to pay some of the licensing fees due under the Licensing Agreement in 2009 and 2010.  This is disputed by Defendants.  As a result of Peak's alleged failure to pay licensing fees, Plaintiff notified Peak of its breach of the Licensing Agreement and gave Peak a 15 day cure period prior to exercising any contractual remedies, as provided in the Licensing Agreement.  When Peak failed to cure its breach, Port-a-Pour terminated the Licensing Agreement by letter dated July 5, 2010.  Defendants admit receiving this letter, but dispute that they breached the agreement.  Peak acknowledged the termination of the Agreement in August, 2010.

III.   ANALYSIS

A.   Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *E.E.O.C. v. Horizon/ CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party. *Horizon/ CMS Healthcare Corp.*, 220 F.3d at 1190. "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). When applying the summary judgment standard, the court must "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Id.* (quotation omitted). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

When cross motions for summary judgment are filed, the court is "'entitled to assume that no evidence needs to be considered other than that filed by the parties, but

summary judgment is nevertheless inappropriate if disputes remain as to material facts.'" *Atl. Richfield Co.*, 226 F.3d at 1148 (quotation omitted).  Cross motions for summary judgment must be treated separately—the denial of one does not require the grant of another.  *Buell Cabinet v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).  I note that the motions address different issues, and Defendants' motion does not address all the claims at issue in Plaintiff's motion.  I address the arguments made in the motions in connection with my discussion of the claims.

      B.      <u>Analysis of the Motions</u>

           1.      <u>Trademark Infringement Claims (Claims 3 and 4)</u>

Plaintiff asserts in its motion that it is entitled to summary judgment on Claims 3 and 4 for trademark infringement, which is disputed by Defendants.  Defendants' motion does not address this claim.  Thus, the analysis below pertains only to Plaintiff's motion and whether summary judgment should be granted in Plaintiff's favor on the trademark infringement claims.

Turning to my analysis, "[t]o prove infringement, the moving party must show: (1) the mark is validly registered; (2) defendants' use of the mark was unauthorized; and (3) defendants' use is likely to cause confusion in the market place concerning the source or quality of the products." *Big O Tires, Inc. v. Bigfoot 4X4, Inc.,* 167 F. Supp. 2d 1216, 1222 (D. Colo. 2001) (citing *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir. 1991)).

I find that element one of an infringement claim is satisfied for purposes of summary judgment.  It is undisputed that Port-a-Pour owns Registered Trademark No.

3,070,009 (the "Trademark"), duly issued and validly registered by the United States

Patent and Trademark Office ("USPTO"), for the name "Port-a-Pour" for use in

connection with a concrete batch mixing machine.  As a federally registered trademark,

Port-a-Pour is entitled to a legal presumption that its Trademark is distinctive.  *Pinehurst,*

*Inc. v. Wick*, 256 F. Supp. 2d 424, 427-28 (M.D.N.C. 2003).  Port-a-Pour first used the

Trademark in commerce in 1985.

As to the second element, it is undisputed that during the term of the Licensing

Agreement, Peak marketed and advertised Port-a-Pour equipment, sometimes in

combination with its own name and sometimes simply as "Port-a-Pour".[6]  I further note

that Peak and Nelson admitted that "Port-a-Pour never authorized [Peak] to use the

Trademark except pursuant to the terms and conditions of the Licensing Agreement."

(Pl.'s Confidential Exs. in Supp. of Pl.'s Mot., ECF No. 132, Ex. 19 at 3, Resp. to Req. for

Admis. # 8.)  Since termination of the Licensing Agreement, I find that Peak has

displayed the "Port-a-Pour" trademark in its advertising—placed itself or by Peak's

"dealer" from and after August, 2010, including through May 14, 2014.  For example,

Peak published a 2013 list of product offerings depicting Port-a-Pour equipment,

including a photograph of equipment bearing the Port-a-Pour Trademark.  Peak also

published photographs of equipment bearing the Port-a-Pour Trademark on its web site,

and published an advertisement in Rock and Dirt that was active as of January 8, 2014,

containing a photograph depicting a horizontal silo bearing the Port-a-Pour Trademark.

---

[6] While Defendants dispute that the Licensing Agreement permitted this use, this is not relevant to my ruling on this claim.

Moreover, it is undisputed that Peak obtained the URLs www.portapour.com and www.port-a-pour.com (the "Port-a-Pour URLs") during the term of the Licensing Agreement, which redirected traffic to Peak's web site, and that Peak continued using the URLs after termination of the Agreement and up through the commencement of suit and the TRO hearing.  (*See* Defs.' Resp. to Pl.'s Mot., Ex. R1 ["Defs.' Resp."], Nelson Dep. at 139:15-140:20.)  Further, Peak and Nelson renewed and maintained the registration of the Port-a-Pour URLs until at least the commencement of this suit.

However, I find that there are genuine issues of material fact as to whether Port-a-Pour authorized the use of its trademark and URLs after the termination of the Licensing Agreement.  Defendants assert in that regard that although the Licensing Agreement did not give Peak the right to use the name "Port-a-Pour," Plaintiff did not object to Peak's use of that name until it filed this lawsuit in June 2013.  Thus, it is possible a reasonable jury could find that Port-a-Pour acquiesced in Peak's use of the Port-a-Pour name.

I also find that there are genuine issues of material fact as to whether Plaintiff has demonstrated a likelihood of confusion created by Peak's misuse of the mark.  Plaintiff relies on actual confusion, citing to testimony from Doherty and Oberg that they received telephone calls from potential customers who had called Peak when they were attempting to inquire about Port-a-Pour products.  Defendants dispute that there was actual confusion, asserting that Doherty's testimony states the confusion in theoretical terms, not actual terms.  They also note that in his deposition, Doherty clarified that he knew of only two or three instances of actual confusion. (Defs.' Resp., Ex. R6, Doherty Dep. at 123:6-15.)

Turning to my analysis, I note that "[l]ikelihood of confusion is ordinarily a question of fact for the jury, but summary judgment is appropriate if no reasonable juror could find that such a likelihood exists. *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013). I find that Plaintiff has not shown that summary judgment is appropriate as to this issue.

First, while "[a]ctual confusion in the marketplace is often considered the best evidence of likelihood of confusion", *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999), "evidence of some actual confusion does not dictate a finding of likelihood of confusion." *Universal Money Centers, Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1535 (10th Cir. 1994). Where there are only isolated instances of actual confusion such that the evidence is de minimis, which appears to be the situation in this case, there is not a genuine issue of material fact regarding likelihood of confusion. *Id.* Moreover, other than the fact that Peak was using Plaintiff's actual mark, Plaintiff did not address the other factors that must be weighed in determining whether there is a likelihood of confusion. *See Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998). As the Tenth Circuit noted, "[n]o one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors. *Id.*

Based upon the foregoing, I deny Plaintiff's Motion for Partial Summary Judgment as to the trademark infringement claims. I also deny Plaintiff's motion to the extent it seeks summary judgment on the issue of whether Peak's use of Port-a-Pour's Trademark was willful and deliberate, finding that there are genuine issues of material

fact as to this issue.  Finally, I deny summary judgment as to Plaintiff's request for fees, cost and injunctive relief in connection with the trademark claim.

        2.    <u>Violation of Anticybersquatting Consumer Protection Act (Claim 5)</u>

Plaintiff also argues that it is entitled to summary judgment on Claim 5 for Peak's violations of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §1125(d).  Again, Defendants' motion does not address this claim.  Thus, I address only whether Plaintiff is entitled to summary judgment on this claim.

In order to state a claim under the ACPA, Plaintiff must show (1) that its trademark "was distinctive at the time of registration of the domain name", (2) that the domain names registered by [Defendants] . . . are identical or confusingly similar to the trademark, and (3) that [Defendants] "used or registered the domain names with a bad faith intent to profit" from that domain name. *Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research*, 527 F.3d 1045, 1057  (10th Cir. 2008).

Defendants do not dispute the first two elements, and I find for summary judgment purposes that they have been established.  Thus, it is undisputed that Port-a-Pour is a federally registered trademark.  As such, Plaintiff is entitled to a legal presumption that its trademark is distinctive, *Pinehurst, Inc.*, 256 F. Supp. 2d at 427-28, which Defendants have not rebutted.  I further find for summary judgment purposes that the trademark was distinctive at the time the domain name(s) was registered, which Defendants have not contested.  It is undisputed that Peak continued to use the Port-a- Pour URLs, and renewed and maintained the registration of these URLs, after the termination of the Licensing Agreement and up through at least the commencement of suit.

The only element that Defendants dispute is the third element.  The Tenth Circuit has noted that the ACPA "enumerates nine nonexclusive factors to assist the court in determining whether the use of a trademark involves a bad faith intent to profit." *Utah Lighthouse,* 527 F.3d at 1057.  Plaintiff did not address these factors, nor did it show that it is undisputed as a matter of law that Defendants used or registered the Port-a-Pour domain names with a bad faith intent to profit from those names.

Moreover, Defendants argue that many of the factors resolve in its factor.  For example, they assert that Peak's prior use of the name "port a pour" was contemplated by the parties under the Licensing Agreement and was a permissible use by Peak.  They also note that there is no evidence that Peak has offered to sell the domain to Port-a-Pour or any third party for third gain.  *See Utah Lighthouse Ministry*, 527 F.3d at 1058 ("The quintessential example of a bad faith intent to profit is when a defendant purchases a domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price.")  There is also no evidence that Peak presented false contact information when applying for registration of the domain, or that it is engaging in a practice of acquiring multiple domain names that are identical and confusingly similar to others.  *See* 15 U.S.C. § 1125(d)(1)(B)(i).

Finally, I note that the ACPA contains a mandatory "safe harbor" and the court is not permitted to find bad faith ". . . in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).  Here, it is undisputed that Peak obtained the domain name during the term of the Licensing Agreement.  While

-14-

the Licensing Agreement is silent as to the use of the name "Port-a-Pour," Defendants argue that it is evident that the parties contemplated that Peak would be able to legitimately use the name at least during the term of the agreement.

Accordingly, I find that there are genuine issues of material fact as to the bad faith element. Plaintiff's motion is thus denied as to the claim under the ACPA.

### 3. Breach of Contract Claims (Claims 7 and 8)

The motions of both parties make arguments as to these claims. I first address Plaintiff's arguments made in its motion.

#### a. Plaintiff's Motion

Plaintiff also seeks summary judgment on its breach of contract claims. "A party attempting to recover for breach of contract must prove: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages." *City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 477 (Colo. App. 2003). In this case, the contracts include the Licensing Agreement and the Confidentiality Agreement.

In support of its motion, Plaintiff first relies on the Preliminary Injunction Order. (Prelim. Inj. Order, § III, ¶¶ 9-35.) Plaintiff cites my finding that "Peak breached the Licensing Agreement by continuing to sell products that were derived form the proprietary information provided to it by Port-a-Pour." (*Id.*, ¶ 22.) It also relies on the finding that "for purposes of the preliminary injunction motion [certain of Peak's horizontal silos] are derived in material part on Port-a-Pour's protected information in violation of the Licensing Agreement and the Confidentiality Agreements." (*Id.*, ¶ 28.)

I reject Plaintiff's argument that my preliminary injunction ruling warrants summary judgment in Plaintiff's favor on the breach of contract claims.  First, the ruling only found for purposes of the preliminary injunction motion that Plaintiff demonstrated a likelihood of success on the merits on the breach of contract claim.  (Prelim. Inj. Order, § III, ¶ 28.)  Second, the finding regarding the breach of contract was based upon evidence presented at the preliminary injunction hearing.  (*Id.*, ¶ 22.)  As such, those findings are not binding on the merits at this juncture of the litigation.  As the Tenth Circuit has noted:

> A hearing for preliminary injunction is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules. The Federal Rules of Evidence do not apply to preliminary injunction hearings. . . . Thus, as a prudential matter, it bears remembering the obvious: that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits.

*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

Thus, findings of fact and conclusions of law that are made by a court granting a preliminary injunction are generally not binding at trial on the merits.  *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009).  For that reason it would be inappropriate for the court to permit Plaintiff to meet its initial burden of production, which always remains on the moving party, with findings of fact from a preliminary injunction hearing.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 330(1986).[7]

Plaintiff also argues that summary judgment is appropriate as to this claim because none of the elements of a breach of contract claim are in dispute.  I agree that

---

[7] Again, however, to the extent I made findings as a matter of law regarding the Agreements, those findings are valid at this stage.  Those findings were not based on the preliminary injunction hearing but on my interpretation of the Agreements.

there is no dispute as to the existence of the Agreements.  There is also no genuine

issue of material fact as to the scope of the Agreements to the extent I have already

interpreted the Agreements as a mater of law.  However, I find that there are genuine

issues of material fact as to the second and third elements of a breach of contract claim.

Thus, while Plaintiff  argues that it performed all of its obligations under the

Agreements, Defendants dispute this on the basis that Plaintiff did not set out any

specific facts to support this factual allegation.  I agree with Defendants that Plaintiff

provided no evidence to support this fact or to show that this fact is undisputed.  *See*

Fed. R. Civ. P. 56(c)(1); Section III.B.3 of my Practice Standards.  Moreover, Defendants

dispute this allegation, and I find that there are genuine issues of material

fact as to this issue, including whether Port-a-Pour provided adequate drawings to

fabricate a complete operating plant as required under the Licensing Agreement.[8]

I also find that there are genuine issues of material fact as to whether Peak failed

to perform its obligations under the Licensing Agreement by failing to pay the minimum

licensing fees due in 2009 and 2010.  Further, I find that there are genuine issues of

material fact as to whether Peak continued to use the rights Port-a-Pour licensed to Peak

under the Licensing Agreement after the expiration of the license.

Finally, I find that there are genuine issues of material fact as to whether Peak

and Nelson breached the Confidentiality Agreement.  First, while Plaintiff asserts as an

undisputed fact that it performed all of its obligations under that agreement, it did not set

---

[8] While Plaintiff argues that Defendants' claim that it failed to perform under the Licensing
Agreement is barred by the equitable doctrines of laches and estoppel, I find that these issues were not
adequately briefed in the summary judgment motions and should be resolved at trial.

out any evidence to support this.  Moreover, as to Defendants' alleged breach of the

Confidentiality Agreement, Plaintiff relies on the Court's findings based on evidence

presented at the preliminary injunction hearing.  (Prelim. Inj. Order § III, ¶¶ 25, 28.)  As

noted previously, these evidentiary findings are not binding at this stage of the litigation.

Further, I find that Defendants have presented evidence to show that there is a

genuine issue of material fact as to whether the Confidentiality Agreement was

breached.  Defendants assert that the 60-40 percentages discussed by Nelson and

relied on by Plaintiff—that 60% of the design of Peak's plant came from Port-a-Pour

versus 40% from Peak or other sources—related only to the design of the Emil Anderson

plant, a Series II plant, not all the equipment manufactured by Peak, and that Peak

participated in a "design build" process related to the Series II.  (Defs.' Resp., Ex R2, Inj.

Tr. at 310:18-20, 314:9–315:1.)  They further point to, among other things, Nelson's

testimony that by 2009, Peak had stopped using all of Port-a-Pour's designs.  (*Id.* at

315:2-15.)  Finally, Defendants assert that Peak did not use Plaintiff's horizontal silo

designs, citing to Nelson's deposition testimony and testimony at the preliminary

injunction hearing.  (*Id.*, Ex. R1, Nelson Dep. at 42:2-8; Ex. R2, Inj. Tr. at 331:23-332:1.)

Accordingly, Plaintiff's Motion for Partial Summary Judgment is denied as to the

breach of contract claims.[9]

---

[9] I reject Plaintiff's argument in its reply brief that it is entitled to summary judgment on
Defendants' affirmative defenses of fraud and misrepresentation regarding the Agreements.  Plaintiff
argues in that regard that Defendants failed to carry their burden as to these defenses because they did
not provide any facts or evidence to support them.  However, Defendants were not required to present
such evidence because Plaintiff's motion did not seek summary judgment or show that summary judgment
was appropriate as to these affirmative defenses.  *See Considine v. Newspaper Agency Corp.,* 43 F.3d
1349, 1357 (10th Cir. 1994) (only after the moving party meets its burden on summary judgment "does the
burden shift to the nonmoving party to identify specific facts that show the existence of a genuine issue of

b.     Defendants' Motion

Defendants argue that Plaintiff's contract claims for unpaid royalties are barred by the three-year statute of limitations.  Alternatively, Defendants argue that the Licensing Agreement does not provide for royalties on Series II plants that were not sold, leased, or capitalized, and that there can be no contract claim for unpaid royalties on "auxiliary equipment," since the contract did not provide for a royalty on such equipment.

I first address the statute of limitations.  I previously found, and reaffirm, that the contract claims are subject to a three year statute of limitations under Colo. Rev. Stat. § 13-80-101(1)(a).  (*See* Order of July 14, 2014, ECF # 133, at 11, ¶ B.2.c.)  An action for breach of contract accrues "on the date the breach is discovered or should have been discovered by the exercise of reasonable diligence."  *Nelson v. State Farm Mut. Auto. Ins. Co.*, 419 F.3d 1117, 1121 (10th Cir. 2005) (citing Colo. Rev. Stat. § 13-80-108(6)).  Defendants assert that it is undisputed based on Doherty's testimony that Plaintiff knew the minimum royalty payments had not been made as of February 28, 2009.  (Defs.' Mot., Ex. D, Doherty Dep. at 71:18-24).  Doherty stated that date is when Peak "first came out of compliance with the licensing agreement." (*Id.*)  Defendants thus contend that Plaintiff's claim for breach of contract for unpaid royalties became barred three years later, on March 1, 2012, well over a year before Plaintiff filed suit.

I reject Defendants' argument.  As Plaintiff notes, the Licensing Agreement provides for notice from Port-a-Pour and an opportunity for Peak to cure before remedies

---

material fact").  Further, I decline to consider arguments raised for the first time in a reply brief.  *See Iqbal v. Holder*, 693 F.3d 1189, 1195 n. 4 (10th Cir. 2012).

can be enforced.  (Pl.'s Mot., Ex. 1, ¶ 4.01(a).)  Under this circumstance I find that the

cause of action accrues at the end of the cure period, not when the default occurs.  *See*

*Green Tree Fin. Serv. Corp. v. Short*, 10 P.3d 721, 722-23 (Colo. App. 2000).  Here,

notice of Peak's breach and the commencement of its 15-day cure period was given on

July 5, 2010 (Mot. for TRO and/or Prelim. Inj., ECF No. 7, Ex. E), and the 15-day cure

period ended on July 20, 2010.  Under the rationale of *Green Tree*, the cause of action

for breach of contract accrued on July 20, 2010.  This action was filed on June 9, 2013,

within the three-year limitation period.

I now turn to Defendants' argument that the Licensing Agreement does not

provide for royalties on Series II plants that were not sold, leased, or capitalized.  This

requires interpretation of the contract which is an issue of law for the Court to determine.

*Arapahoe Cnty. Water & Wastewater Pub. Improvement Dist. v. HDR Eng'g, Inc.*, No.

08-cv-01788-WYD, 2011 WL 5025022, at *2 (D. Colo. Oct. 21, 2011) (citing *Premier*

*Farm Credit, PCA v. W–Cattle, LLC,* 155 P.3d 504, 517 (Colo. App. 2006)).  "In

construing [a contract], the primary obligation 'is to effectuate the intent of the contracting

parties according to the plain language and meaning of the contract.'" *Id.* (quotation

omitted).  "'The overriding rules of contract interpretation require a court to apply the

plain meaning of the words used, subject to interpretation from the context and

circumstances of the transaction.'"  *Id.* (quotation omitted).

In the case at hand, I agree with Defendants that the Licensing Agreement

unambiguously required Peak to pay Port-a-Pour a licensing fee of $50,000.00 "per unit

on the first two (2) mobile batch plant units sold or rented. . ." and $20,000 thereafter

"per unit on all subsequent units *rented, capitalized, or sold* by Licensee, Licensor, or an authorized third party."  (Def.'s Mot., Ex. A, § 3.02) (emphasis added.)  I further agree with Defendants that the only "units" under the Licensing Agreement on which licensing fees were owed were the Series II batch plants, as referenced in § 3.02.  (*See also* Defs.' Mot., Ex. B, Inj. Tr. at 233:7-23.)  The units were "considered as sold when invoiced, or rented as of the date of the Rental Agreement, and capitalized as of the date when any funds are realized from capitalization are received." (*Id.*, Ex. A, § 3.05.)  The licensing fee was "due and payable to Licensor not later than thirty (30) days" after any of these events.  (*Id.*)  "If Agreement Products are to be manufactured and used by Licensee, then the licensing fee shall be due at the time of completion of manufacture." (*Id.*)  It appears to be undisputed that licensing fees were paid on the 14 Series II units that Peak rented, capitalized, or sold.  (*Id.*, Ex. D., Doherty Dep. at 49:14-23; ECF No. 140-2, Decl. of Katherine Nelson, ¶¶ 2-4.)[10]

The Licensing Agreement also, however, required minimum payments of royalty fees.  (Defs.' Mot., Ex. A.)  It required Peak after the second year to pay $20,000 per unit "for at least eight (8) units per year [$160,000 total] for each of the following ten (10) years." (*Id.*, § 3.03.)  Defendants assert that they are entitled to summary judgment on Plaintiff's claim that Peak breached the agreement by not making all these payments because the exclusive, unambiguous remedy for failure to pay these minimum licensing

---

[10] While no licensing fee was paid on the final Series II (#DB20316), it was never completed for lack of demand.  Instead, it was cannibalized for parts and then scrapped.

fees was termination of the relationship, not recovery of damages for units that Peak

never built.  The Licensing Agreement states as to this issue:

> If Licensee fails to pay the annual minimum licensing fees as set forth in this paragraph in a timely and complete fashion, *then the rights granted to Licensee may be terminated in accordance with provisions of this Agreement*.

(*Id.*) (emphasis added).

Defendants argue that this right of termination does not preserve a right to future

damages for units not leased, sold, or capitalized.  Instead, they assert that § 4.01(a)

preserves the right only to recover sums "due" at the time of termination.  I disagree.

While Defendants are correct that § 4.01(a) of the Licensing Agreement states that

termination "shall not prejudice the right of Licensor to recovery any licensing fees,

interest, or other sums due at the time of such cancellation or termination", it also states

that termination *"shall not prejudice any cause of action or claim of Licensor accrued or*

*to accrue on account of any breach or default by Licensee"*.  (*Id.*)  Giving effect to all

provisions of the contract as I must, *see Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208

P.3d 692, 700 (Colo. 2009), I agree with Plaintiff that the Licensing Agreement preserved

the right to claims that accrued on account of a breach or default, which I find would

include a breach related to the minimum royalty fees that were due each year.[11]

Defendants also argue that Plaintiff cannot prove "other" breaches of contract, as

Plaintiff has not presented any competent evidence that the contract was otherwise

---

[11] In so finding, I reject Defendants' argument that under Colorado law, a contract must contain an express provision reserving the right to post-termination damages.  The cases cited by Defendants are limited to the landlord/tenant relationship and the unique law applicable to same.

breached.  I note, however, that Plaintiff alleges that when the license terminated, Peak did not return to Port-a-Pour and cease using all drawings and design information as required by Section 4.01(b) of the Licensing Agreement.  While this is disputed by Defendants, I find that there are genuine issues of material fact as to this issue, and this could be found to be another breach of the agreement.  Accordingly, I deny this argument.

Finally, Defendants argue that there is no contract claim for equipment other than the Series II, as the contract does not provide for royalties for other equipment.  While I previously found, and have reaffirmed, that the Auxiliary Silo is encompassed within the Agreements, I agree with Defendants that the "unit" referred to in the Licensing Agreement for which royalties are due is only the Series II batch plant.  Thus, I agree that any contract claim for damages related to auxiliary equipment fails for lack of damages because no licensing fees were due for this equipment.  Defendants' motion is thus granted as to this issue.

Based on the foregoing, Defendants' motion is granted in part and denied as to its arguments regarding the breach of contract claims.

### 4.    Misappropriation of Trade Secrets (Claim 6)

Both motions address this claim.  Again, I first address the arguments made in Plaintiff's motion before turning to Defendants' motion.

### a.    Plaintiff's Motion

Plaintiff argues that the Preliminary Injunction Order establishes Plaintiff's claim for misappropriation of trade secrets under the Colorado Uniform Trade Secrets Act.

Additionally, Plaintiff asserts that Peak's and Nelson's misappropriation was attended by circumstances of willful and wanton disregard for Port-a-Pour's rights, which it argues entitles Port-a-Pour to an award of exemplary damages.

I deny Plaintiff's Motion for Partial Summary Judgment as to the trade secrets claim. While I found in the Preliminary Injunction Order that Plaintiff had shown a likelihood of success on its claim for misappropriation of trade secrets based on evidence presented at the hearing (Prelim. Inj. Order, § III, ¶¶ 38-44), that finding was made only for purposes of the preliminary injunction motion and is not binding on the merits at this juncture of the litigation. Further, to the extent Plaintiff seeks summary judgment on this claim independent of my ruling on the preliminary injunction motion, Plaintiff has failed to show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law on ths claim.

b.    <u>Defendants' Motion</u>

Defendants argue that Plaintiff's claim for trade secret infringement fails because it cannot prove any of the factors in *Hertz v. Luzenac Group*, 576 F.3d 1103 (10th Cir. 2009). Thus, they assert they are entitled to summary judgment on Plaintiff's trade secrets claim because there are no genuine disputes as to any material facts. I disagree, and deny Defendants' motion as to this claim.

As noted in the Preliminary Injunction Order, the Colorado Uniform Trade Secrets Act, Colo. Rev. Stat. § 7-74-101, *et seq.,* governs the misappropriation of trade secrets. *See Doubleclick, Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1257 (D. Colo. 2005). A "trade secret" is defined "broadly to include all or part of virtually any information that is of

-24-

value, whether it be in the nature of scientific, technical, business, financial, or professional information, as long as the owner has taken measures to prevent it from becoming available beyond those to whom he has given limited access." *Gognat v. Ellsworth*, 259 P.3d 497, 501 (Colo. 2011). "Misappropriation" is also "defined broadly to include the 'acquisition' of a trade secret by anyone who has reason to know it was acquired by improper means, as well as the 'disclosure' or 'use' of a trade secret without consent by anyone who acquired it improperly or had reason to know that his knowledge of it came from someone who got it improperly or under circumstances giving rise to a duty to either keep it secret or limit its use." *Id.* at 500-01.

What constitutes a trade secret is a question of fact. *Ovation Plumbing, Inc. v. Furton*, 33 P.3d 1221, 1223 (Colo. App. 2001). Several factors are relevant to the factual determination of whether a trade secret exists. *Saturn Sys. Inc. v. Militare*, 252 P.3d 516, 521 (Colo. App. 2011). This includes "(1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business; i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the saving effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *Hertz*, 576 F.3d at 1108; *Saturn Systems*, 252 P.3d at 521-22. "[R]easonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on a 'need to know basis,' and controlling plant access."

*Network Telecommunications, Inc. v. Boor-Crepeau*, 790 P.2d 901, 902 (Colo. App. 1990).  "The efforts to maintain secrecy are those reasonable under the circumstances and do not require that extreme and unduly expensive procedures be taken to protect trade secrets." *Id.*

In the case at hand, I find that there are genuine issues of material fact as to what information was a trade secret.  I note, however, that Defendants agreed in the Licensing Agreement that Port-a-Pour "is the owner of trade secrets and other proprietary information relating to a portable batch plant for making concrete, and plant support equipment".  (Defs.' Mot., Ex. A, Recitals and § 1.02.)   Further, it agreed to a definition of trade secrets which included drawings and specifications "relevant to the manufacture, use, sale and assembly of a mobile concrete batch plant".  (*Id.*)  Thus, unless the Licensing Agreement is invalid for some reason, it appears that Port-a-Pour's drawings and specifications relevant to the manufacture, use, sale and assembly of a mobile concrete batch plant are trade secrets.

While Defendants argue and present evidence that portable concrete batch plants and auxiliary silos with the same elements as the Series II are in the public domain, I find that the evidence is disputed about this.  Plaintiff presented evidence that Port-a-Pour's designs for its product lines, *i.e.,* the Proprietary Information and trade secrets protected in the Agreements, are not generally known throughout the industry. Plaintiff asserts that while the general concepts of, for example, air slides, conveyor belts, dust filters, and other elements of Port-a-Pour's product lines are generally known (*see, e.g.,* Prelim. Inj. Tr., ECF No. 98, at 145-163), Port-a-Pour's specific designs,

including the combination of elements and specific design details and specifications of Port-a-Pour's product lines, are proprietary to Port-a-Pour and are not generally known in the industry.  (*Id.* at 29-32, 170-74, ECF No. 70 at 287-90; Third Doherty Third Decl., ECF No. 131, at ¶ 4.)

There is also evidence that Port-a-Pour spent quite a bit of effort and money in developing its Proprietary Information, and that it would take a lot of time and expense for others to duplicate the information.  Indeed, Doherty testified that during 22 of the 30 years that Oberg worked for Port-a-Pour, it spent $880,000.00 "on the Port-a-Pour Series II and related equipment."  (Defs.' Mot., Ex. B, Inj. Tr. at 181:9-15.)  While Defendants point to a letter dated July 5, 2009, wherein Doherty stated that the majority of the development money had been spent on the chemical admixture system and patenting it (Defs.' Mot., ECF No. 141-8), a reasonable jury could find that Port-a-Pour also spent a substantial amount of time and money in connection with the Series II and related equipment.

Further, while Defendants rely on the deposition testimony of Port-a-Pour's employee Gerald Noel Huffman ("Huffman") to support their argument that the Port-a-Pour drawings claimed to be trade secrets were well known within Port-a-Pour, and note that Huffman did not sign a confidentiality agreement, they acknowledge that Doherty testified at the preliminary injunction hearing as to the steps Plaintiff has taken to protect its trade secrets.  These include keeping drawings and specifications locked in an office where only he and Oberg have access and requiring a password on the computer that contains those drawings.  (Defs.' Mot., Ex. B, Inj. Tr. at 188:16-189:1.)  Moreover, in

response to Defendants' motion, Plaintiff presented a Declaration of Huffman stating that he knew, understood, and agreed that the design of Port-a-Pour's drawings were confidential, proprietary, and trade secrets and were given to him solely for the purpose of doing his job.  (Pl.'s Resp. to Defs.' Mot., Huffman Decl., ¶¶ 6-8.)[12]

As to misappropriation of the trade secrets, Plaintiff asserts that when the License terminated, Peak did not return to Port-a-Pour and cease using all drawings and design information as required by Section 4.01(b) of the Licensing Agreement.  Further, it points to testimony from Nelson that Peak never stopped using the manufacturing drawings, and asserts that Peak continues to use Port-a-Pour's designs in its products at least to some extent.  (Prelim. Inj. Tr., ECF No. 71, at 314, 339-340.)  While Defendants deny this, I find that there are genuine issues of material fact as to this issue.

Finally, while Defendants argue that Port-a-Pour's representation to Peak that its new batch plants were not subject to royalties estops Plaintiff from its trade secrets claim or that Plaintiff's claim is barred by the doctrine of laches, I reject these arguments.  Whether or not a royalty is due on equipment under the Licensing Agreement is not necessarily determinative of whether Peak misappropriated Port-a-Pour's trade secrets.  Thus, the motion is denied as to the equitable estoppel issue.

I also deny Defendants' motion as to the laches argument.  Defendants argue in that regard that Port-a-Pour knew in July 2009 that Peak was manufacturing batch plants

---

[12] While Defendants object to this Declaration, I find it is not necessarily inconsistent with Huffman's deposition testimony.  Instead, it appears to be a clarification of what he understood about the confidential or proprietary nature of Plaintiff's drawings and information.  It does not appear to be a sham affidavit.  *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

and chemical admixture systems that allegedly infringed its patents and purported trade secrets, but sat on its rights for four years.  However, as Plaintiff points out, in 2009, Peak was Port-a-Pour's licensee, and was fully authorized to use its patents and trademarks.  I cannot find as a matter of law that Plaintiff unreasonably slept on its rights. *See Bristol Co. L.P. v. Bosch Rexroth, Inc.*, 758 F. Supp. 2d 1172, 1177 (D. Colo. 2010). There appear to be genuine issues of material fact about these issues.

Accordingly, Defendants' *Corrected* Motion for Partial Summary Judgment is denied as to the trade secrets claim.

### 5.   Infringement of the '886 Patent (Claim 2)

Both parties' motions also address the patent infringement claim.  Again, I first address Plaintiff's motion before turning to Defendants' motion.

### a.   Plaintiff's Motion

I note that the USPTO duly issued two patents for inventions of Doherty and Oberg; namely, U.S. Patent No. 6,876,904 (the "'904 Patent") and U.S. Patent No. 7,050,886 (the "'886 Patent") (collectively "the "Patents").  I found in my Order of January 20, 2015, that Oberg and Doherty assigned the Patents to Port-a-Pour.  Accordingly, Port-a-Pour is thus the owner of the Patents.  Plaintiff argues that the Court's Preliminary Injunction Order establishes Claim 2 for Peak's literal infringement of the '886 Patent, and Plaintiff's entitlement to summary judgment on such claim.  I reject this argument as my ruling found only a likelihood of success on the merits of the infringement claim based on evidence presented at the preliminary injunction hearing.  The finding was made only for purposes of the preliminary injunction motion.

Plaintiff also argues, however, that it is entitled to summary judgment on the '886 Patent based on Peak's admission that it used Port-a-Pour's patented chemical metering system on three post-License plants.  Specifically, in response to an interrogatory asking "Please set forth in detail every fact supporting your assertion that Peak did not infringe on the '886 Patent, and identify every document evidencing, supporting or relating to such fact," Peak responded as follows:

> Note, however, that there are three instances of the chemical dosing system being used on a post-licensing agreement concrete production plant, specifically units AB2-07, AB2-08, and AB2-09. The foregoing should not be taken as an admission of infringement, however, as the '886 Patent is not valid, for the reasons discussed in response to interrogatory #3.

(Pl.'s Confid. Exs., ECF No. 132-18, Resp. to Interrog. 14.)  Plaintiff asserts that this is an admission of at least three instances of infringement of the '886 Patent.

I find that while the admission is certainly relevant to the infringement issue, the factfinder should be tasked with determining the meaning of the admission.  This is particularly true based on Plaintiff's admission that both Peak and Nelson are lay persons and are not necessarily qualified to opine concerning patent elements.  Moreover, Peak's discovery response also asserts that the patent is invalid, an issue I address below in connection with Defendants' counterclaim.  Finally, Plaintiff has not demonstrated through any other evidence that the '886 Patent was infringed.  Indeed, Plaintiff has not discussed the claims of the patent in any detail or provided evidence to show how the products sold by Peak infringed those claims.

Accordingly, Plaintiff's Motion for Partial Summary Judgment is denied as to the infringement claim regarding the '886 Patent.

    b.    <u>Defendants' Motion</u>

Defendants argue that they are entitled to summary judgment on Plaintiff's patent infringement claims.  As a preliminary matter, they assert and I agree that there can be no patent infringement during the period of the Licensing Agreement, that is, prior to July 2010 when Nelson acknowledged its termination.  With respect to any alleged patent infringement occurring *after* that time, Defendants assert that Plaintiff's claims must be dismissed for three reasons.  First, Plaintiff has never asked to inspect nor inspected the accused devices; namely, the portable batch plants or the admixture system that allegedly infringe the Patents.  Without analyzing the accused devices in light of all the claims of the patents-in-suit, Defendants assert that it is impossible for Plaintiff to refute Defendants' testimony that the accused devices do not infringe.

I reject Defendants' argument, and deny their motion as to this issue.  Even though Plaintiff has not physically inspected Peak's products, I find it has offered admissible evidence of Peak's infringement in response to Defendants' motion sufficient to create a genuine issue of material fact.

Thus, as to the '886 Patent, Plaintiff asserts that Oberg, one of the co-inventors of the chemical metering system protected by that patent, examined a Peak quotation to sell a chemical metering system issued in the summer of 2013, after this lawsuit was filed, which contains technical specifications for the system.  (Oberg Fourth Confidential Decl., ECF No. 151, at ¶ 3 and Ex. 1 thereto.)  Oberg stated that he knows exactly what chemical metering system Peak built during the licensing period because he taught Nelson and Peak how to build Port-a-Pour's patented chemical metering system as well

as the patented concrete batch plant.  (*Id.*, ¶¶ 3-4.)   Based on Oberg's review of the

quotation, pictures of Peak's offerings from October, 2013 (which are identical to pictures

on Peak's site during the term of the Licensing Agreement), Oberg's own knowledge of

the patented chemical metering system and Oberg's personal knowledge of the chemical

metering system Peak built during the term of the Licensing Agreement, and Peak's

admissions and testimony in this case, Oberg asserts that Peak has infringed the '886

Patent.  (*Id.*, ¶¶ 5-9 and Ex. 1 thereto.)  Plaintiff also points to the alleged admission by

Peak that it was infringing this patent.  (Pl.'s Confid. Exs., ECF No. 132-18, Resp. to

Interrog. 14.)

As to the '904 Patent, Oberg is also the co-inventor of the concrete batch plant

protected by that patent, and is aware of the claims contained therein as well as the

designs to build a patented plant transferred to Peak under the Licensing Agreement.

Oberg states in his Declaration that he examined a quotation for a concrete batch plant

issued by Peak in the summer of 2013, after this lawsuit was filed.  (Oberg Fourth

Confidential Dec., ECF No. 151, at ¶¶10-11 and Ex. 2 thereto.)  Based on Oberg's claim-

by-claim comparison of the '904 Patent against Peak's batch plant quotation, Oberg

affirms that Peak's offered batch plant infringes the '904 Patent.  (*Id.*, ¶¶10-12.)[13]

---

[13] I reject Defendants' argument that Oberg's Declaration is a sham and should be disregarded.
Defendants also assert that in spite of every opportunity to testify that he inspected the diagrams for the
accused devices, Oberg failed to do so until his current declaration, and failed to include copies of those
diagrams that he allegedly reviewed and compared to his own diagrams for Defendants to review, failing
to meet the basic requirements of Fed. R. Civ. P. 56(c).  I reject this argument, finding for summary
judgment purposes that Oberg's Declaration was adequate.  Finally, Defendants argue that Oberg is not
an expert and that at his deposition, he did not answer questions about claim.  Further, they note that at
the deposition, Oberg's attorney objected to questions about claims as calling for legal conclusions.  They
argue that Plaintiff cannot have Oberg propound on the patent claims as an expert to avoid summary
judgment and not allow him to testify as to the meaning of the claims in his deposition.  I find this is not an
issue that should be resolved at the summary judgment stage, as I do not have enough information to

Plaintiff also refers to the previously-filed Declarations of Doherty and Oberg which it contends are also evidence of Peak's misappropriation of Port-a-Pour's proprietary designs and infringement of the '886 and '904 Patents.  (ECF Nos. 8, 31-1, 36, 131, 132 and relevant attachments.)

Defendants also argue, however, that both the doctrines of equitable estoppel and laches prevent Plaintiff from prevailing on the patent infringement claims.  As to equitable estoppel, Defendants again rely on Plaintiff's letter of July 5, 2009, written to Peak which states:

> I don't think the Peak plant is very similar to the Port-A-Pour and since we didn't participate in the design, I don't think there would be a royalty due . . . Port-A-Pour spent most time and money developing and patenting the chemical metering system. . . A royalty of $2000.00 per metering system seems reasonable . . .

(Defs' Mot., ECF No. 141-8.)  Defendants argue that Plaintiff is now taking a position inconsistent with that.  Not only is it claiming that it spent over $800,000.00 developing both the batch plant and the admixture system, it is claiming that everything that Peak does infringes its patents.  Again, I reject Defendants' argument, finding that Defendants have not demonstrated as a matter of law that either equitable estoppel or laches applies.  At the very least, there are genuine issues of material fact as to these issues, and summary judgment is improper.

Furthermore, Defendants argue that, at most, Port-a-Pour should be limited to damages of $2,000.00 per infringing admixture system that Peak manufactured or sold after July 2009.  Nelson testified that Peak relied upon the assurances of Port-a-Pour in

---

make an informed decision on the issue.

its letter of July 5, 2009, in continuing to manufacture plants and in realizing that if it did

sell an admixture system, it would only be liable to as much as $2,000.00 each. (ECF

No. 143-4, Nelson Decl., ¶ 9.) Again, I find that there are genuine issues of material fact

as to this issue. Indeed, reliance is a generally a question of fact for the jury. *See*

*Schmidt v. Farm Credit Services*, 977 F.2d 511, 516 (10th Cir. 1992).

Based on the foregoing, Defendants' *Corrected* Motion for Partial Summary

Judgment is denied as to Plaintiff's patent infringement claims.

### 6.     Peak's Counterclaims and Third Party Claims

Plaintiff's motion also seeks summary judgment as to Peaks Counterclaims and

Third Party Claims. Defendants' motion does not address these claims.

#### a.     Counterclaims for Non-Infringement and Patent Invalidity

Plaintiff argues that Peak's asserted counterclaims of non-infringement and

invalidity of the '904 and '886 Patents fail because Peak cannot present any evidence at

all—let alone clear and convincing evidence—to overcome the strong presumption of

validity that attaches to every patent, including the '904 and '886 Patents, by virtue of

issuance by the USPTO. That is because Peak has not disclosed any expert testimony

as to noninfringement or the invalidity of the Patents, and the expert disclosure deadline

expired on January 15, 2014. Further, Plaintiff points to Defendants' admission that

Defendants Peak and Nelson are laypersons and do not know the legal elements of the

claim for invalidity of a patent. Defendants assert in response that both Nelson and Peak

are well aware of the facts related to invalidity of the patents in suit, and point to Nelson's

testimony on a number of issues related to the patents.

The issue I must resolve is whether Defendants' failure to designate Nelson or anyone else as an expert is fatal to their counterclaims.  Turning to my analysis, patents are "presumed valid' and '[t]he burden of establishing invalidity ... rest[s] on the party asserting such invalidity.'"  *Microsoft Corp. v. i4i Ltd. P'ship*, ___ U.S. ___, 131 S. Ct. 2238, 2243 (2011) (quotation omitted).  A defendant seeking to overcome the presumption of validity "must persuade the factfinder of its in-validity defense by clear and convincing evidence."  *Id.*  "Issues of patent validity are analyzed in great part from the perspective of a person of ordinary skill in the art, and testimony explaining the technical evidence from that perspective may be of great utility to the factfinder." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361 (Fed. Cir. 2008).

While Plaintiff argues that the Federal Circuit's ruling in the *Sundance* case unequivocally held that lay testimony is precluded as to the issue of invalidity, I disagree. Instead, it held that it was "an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity" when that witness was not qualified as an expert in the pertinent art.  *Id.* at 1363.  There, the court found it was an abuse of discretion for the district court to allow a patent attorney with no expertise in the technical field and who was not qualified as a technical engineer to testify on the issues of infringement and validity.  *Id.* at 1361-63.  The Federal Circuit made clear, however, that expert testimony is not required in every case where invalidity is asserted.  Thus, for example, it stated that an expert would not be required where "[t]he technology is simple and neither party claims that expert testimony is required to support such a holding".  *Id.* at 1365.

Plaintiff asserts, however, that the technology is not simple and that it *does* contend that expert testimony is required.  However, Plaintiff's argument would appear to defeat its own patent infringement claims, as Plaintiff has not designated an expert. Patent claims, identification of claim elements, and the determination of infringement itself, like an assertion of invalidity, are construed from the perspective of one of ordinary skill in the art.  *Sundance, Inc.*, 550 F.3d at 1361 n. 3.  The requirement of an expert would be equally applicable to those issues.  As I am unable to determine from the record whether an expert is required, I reject this argument for purposes of summary judgment.  The necessity of expert testimony is an issue, however, that will require further inquiry and resolution.

### b.      Counterclaim for Trademark Cancellation

Plaintiff argues that Peak's counterclaim that Port-a-Pour has "abandoned" its trademark is frivolous and without foundation.  Port-a-Pour outlines its ongoing use of its Trademark, which use includes (a) continuous maintenance of the website www.portapourinc.com, which displays Port-a-Pour's products and offerings in commerce since the termination of the License; (b) continuous use of the name Port-a-Pour on checks, correspondence, business cards, invoices, and other forms of business documents; (c) continuous offering of products bearing the Port-a-Pour Trademark; and (d) fabrication and sale of Port-a-Pour equipment from the termination of Peak's license to the present.  (Doherty Third Decl., ECF No. 131, ¶¶ 6-7; Prelim. Inj. Tr., ECF No. 70, at 185-86.)  Furthermore, Plaintiff asserts that the fact that the Trademark is registered

constitutes *prima facie* evidence of continued use as well as ownership.  *Drexel Enterprises, Inc. v. Richardson*, 312 F.2d 525, 527 (10th Cir. 1962).

In addition, Plaintiff points out that Doherty, Port-a-Pour's president, avers in sworn testimony that Port-a-Pour has never had any intention of abandoning the Port-a-Pour Trademark.  (Doherty Third Decl., ECF No. 131,  ¶¶ 6-7.)  While it admits that Peak's uninterrupted infringement of the Trademark has impaired its ability to advertise its products in its own name, and that this forced Port-a-Pour to list the name of its subsidiary, Divide Constructors, as the contact for Port-a-Pour products (*id.*), this fact alone demonstrates no intent to abandon its Trademark.  Indeed, Port-a-Pour filed this very lawsuit to protect its Trademark and to end Peak's infringement of the Trademark and damage to Port-a-Pour's business and reputation.  (*Id.*)  Intent to abandon "is an essential factor in finding an abandonment."  *Drexel*, 312 F.2d at 527.

I find that there are genuine issues of material fact as to this counterclaim.  While Plaintiff asserts that Peak has no evidence that it ever intended to abandon its Trademark, and no basis for asserting this claim, I disagree.  Defendants points to Oberg's testimony that because Peak had the domain name port-a-pour.com, Port-a-Pour could not maintain what it did not have, and did not fabricate anything because they "wanted to get our website back before we ventured back into the Series II plants and beyond."  (Defs.' Mot., Ex. R5, Oberg Dep. at 150:10-151:6.)  Further, Defendants assert among other things that Plaintiff never actually demanded the domain name back from Peak or that Peak cease using the name, and did not request that ICANN (the Internet Corporation for Assigned Names and Numbers) demand the domain be turned over.  (*Id.*

at 151:21-152:3.)  Further, even though the Licensing Agreement did not give Peak the right to use the name "Port-a-Pour", Defendants assert that Plaintiff did not object to Peak's use of that name until it filed this lawsuit.

Accordingly, Plaintiff's motion is denied as to this counterclaim.

### c. Counterclaim for Breach of Contract

Plaintiff also seeks judgment on the counterclaim alleging that Port-a-Pour failed to provide diagrams, drawings, part and vendor lists and other technical information from which Peak could manufacture a workable portable batch plant for making concrete as promised in the Licensing Agreement.  (*See* Answer, Affirmative Defenses & Countercls. of Peak & Nelson, ECF No. 28, ¶ 78.)  Peak also alleges that Port-a-Pour failed to provide adequate assistance to Peak so that it could manufacture a workable portable batch plant for making concrete as authorized by the Licensing Agreement.  (*Id.*, ¶ 79.)[14]

I note that this counterclaim was previously dismissed as to Doherty and Oberg by Order of July 14, 2014, as they were not parties to the contract.  (ECF No. 133, at 6.) Further, I dismissed the counterclaim to the extent it was asserted by Mark Nelson, as I found that he lacked standing to assert this claim as a non-party to the Licensing Agreement.  (*Id.*)  Finally, I dismissed this counterclaim to the extent it asserted that Port-a-Pour failed to pay Peak royalties, finding it was unsupported under the contract and as pled.  (*Id.* at 6-7.)  The remainder of Peak's counterclaim for breach of contract remains pending against Plaintiff.

---

[14] Peak abandoned its allegations in ¶¶ 81-82 of its Counterclaim in its opposition to Plaintiff's motion to dismiss, ECF No. 45.

Plaintiff seeks summary judgment as to this counterclaim, arguing that Peak's allegations are 100% at odds with the testimony and evidence in this case from the preliminary injunction hearing. Again, however, the evidentiary findings made from that hearing are not binding at this stage of the litigation.

Plaintiff also argues in its reply brief that it is entitled to summary judgment on this counterclaim because Defendants abandoned it by not addressing it in their response brief. I disagree. The Tenth Circuit has stated that when a party fails to respond to a motion for summary judgment (or in this case to a claim raised in the summary judgment motion), the district court "may consider the motion uncontested" as to that claim but "may not grant the motion as a matter of law simply because the nonmoving party failed to respond." *Issa v. Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003). Instead, the court must undergo the traditional Rule 56 analysis, and may grant summary judgment only if the moving party has met its burden of demonstrating that no genuine issues of material fact exists and that it is entitled to summary judgment as a matter of law. *Id.*

Here, the only evidence that Plaintiff points to in support of its motion as to this claim is that Peak admits manufacturing 15 portable concrete batch plants under the license, and that the first one it delivered was in June 2006, less than two months after entering into the Licensing Agreement. While this may be undisputed, Defendants presented evidence disputing the usefulness and adequacy of the diagrams, drawings, part and vendor lists and other technical information provided by Port-a-Pour and whether they were sufficient to create a workable portable batch plant, as discussed both

in Section II and in regard to my analysis of Plaintiff's breach of contract claim.  Further,

Defendants dispute the usefulness of the assistance provided by Plaintiff to Peak.

Based on the foregoing, I find that Plaintiff has not demonstrated that no genuine

issues of material fact exists and that it is entitled to summary judgment as a matter of

law as to this counterclaim.  Accordingly, its motion is denied as to this argument.

     d.  Third Party Claims for Breach of Contract and Fraudulent and Negligent Inducement

Finally, Plaintiff argued that summary judgment should be entered on the third

party claims against Doherty and Oberg.  Plaintiff withdrew that argument in its reply

because those clams were previously dismissed.  Accordingly, this argument is moot.

IV.  CONCLUSION

Based upon the foregoing, it is

ORDERED that the Motion for Partial Summary Judgment filed by Plaintiff Port-a-

Pour, Inc., Jerome J. Doherty, and Neil Oberg on July 14, 2014, is **DENIED**.  It is

FURTHER ORDERED that Defendants' *Corrected* Motion for Partial Summary

Judgment filed by Peak Innovations, Inc. and Mark Nelson on July 25, 2014, is

**GRANTED IN PART AND DENIED IN PART** as to Plaintiff's breach of contract claim,

and **DENIED** as to all other claims.

Dated:  February 10, 2015

       BY THE COURT:

       s/ Wiley Y. Daniel
       Wiley Y. Daniel
       Senior United States District Judge